## THOMPSON *v.* HUBBARD.

## HUBBARD *v.* THOMPSON.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MISSOURI.

Nos. 265, 271. Submitted April 17, 1889. — Decided May 13, 1889.

In this case, it was held, on the facts, that the title to a copyright in a book had passed from the person who secured it to another person, as the result of a completed transaction between them, independently of all agreements in regard to other matters, the consideration for the sale having been paid, and the contract having never been rescinded.

The grantee, having sued the grantor for infringing the copyright, it ap-

peared that although the copyright had been properly secured by the grantor, the grantee, in publishing editions of the book, had, in some of the copies, not printed, in the notice of copyright, either the year or the name, and in others, had omitted the name; *Held,* that he had forfeited the right to sue the grantor for infringement. .

The requirement of the statute in regard to printing the prescribed notice of copyright in the book, is one of the conditions precedent to the perfection of the copyright, the other two being the deposit, before publication, of the printed copy of the title, and the depositing in the public office, within the prescribed time after publication, of copies of the book.

Such requirement in regard to printing the notice extends to editions published by the grantee of a copyright, during his ownership thereof.

The failure of the grantee to print the notice prevents his right of action, even as against his grantor, who originally secured the copyright, from coming into existence.

THESE were cross-appeals from a decree of the Circuit Court of the United States for the Eastern District of Missouri. On the 28th of November, 1882, Alfred H. Hubbard, a citizen of Pennsylvania, carrying on business at Philadelphia under the name of Hubbard Bros., filed his bill of complaint in that court against Nathan D. Thompson, a citizen of Missouri, carrying on business at St. Louis under the name of N. D. Thompson & Co. This bill alleged that in 1880 Thompson was the proprietor of a certain book entitled "Illustrated Stock Doctor and Live Stock Encyclopedia, including Horses, Cattle, Swine and Poultry, with all the facts concerning the various breeds and their characteristics, Breaking, Training, Sheltering, Buying, Selling, profitable use and general care; embracing all the diseases to which they are subject — the causes, how to know and what to do; given in plain, simple language, free from technicalities, but scientifically correct, and with directions that are easily understood, easily applied, and remedies that are within the reach of the people; giving the most recent, approved and humane methods for the preservation and care of stock, the prevention of disease and restoration of health. Designed for the farmer and stockowner, by J. Russell Manning, M. D., V. S., with 400 illustrations. Saint Louis, Mo., N. D. Thompson & Co., Publishers, 520, 522, and 524 Pine Street, 1880;" that the book was a

compilation, the manuscript of which was owned by Thompson; that Thompson entered it for copyright, in accordance with the provisions of the statute; that he deposited a title-page of it in the office of the librarian of Congress, on the 27th of March, 1880, and before its publication; that thereafter, having published the book, he, on the 7th of June, 1880, deposited two copies of it in the office of the librarian of Congress, and printed in every copy of it, on the page next after the title-page, a notice of copyright, as prescribed by statute, and thereby became the owner of the copyright; that, on the 30th of March, 1880, Thompson entered into an agreement in writing with Hubbard Bros., a firm composed of Hubbard and one Ayer, carrying on business in Philadelphia, a copy of which instrument, marked Exhibit A, was annexed to the bill and is set forth in the margin,[1] and which

---

[1] MEMORANDUM OF AGREEMENT.

N. D. Thompson agrees to sell, and does hereby sell, to H. Bros. the entire plates (not less than one thousand pages) of a new book entitled Manning's Illustrated Stock Doctor and Live Stock Encyclopedia, for the sum of $4000, including copyright, the originals of the illustrations, all the stamps for binding the book, and circular plates, and deliver same as soon as first edition now printing is off press, shipping same to Philadelphia, and delivering same well boxed to the depot in St. Louis, free of charge for boxing or drayage. He agrees further to pay for all books manufactured from said plates, upon his order, with his exclusive imprint and copyright, cash within sixty days, and to order not less than five hundred at a time, and to order in time to admit of their being bound after receipt by Hubbard Bros. of the order.

He agrees to pay for all books he orders made from said plates, a net price which shall be ten per cent in advance of cost to H. Bros., of their manufacture, and also the further cost of boxing and drayage.

He further agrees to confine his sales to the following territory: the States of Mo., Ark., Indian Territory, La., Texas, Miss., So. Ill., Kentucky and Tenn., west of Tenn. River.

He further agrees, for the period of two years, to publish no books except those he now has in course of publication, viz.: Texas History, Almanac and the Tice Almanac, and to devote his energies largely for the above period to the vigorous prosecution of the sale of the publications (Books and Bibles) of Hubbard Bros., and theirs exclusively, including bibles, aside from his own as named, paying for the same within sixty days of date of bills at the rate of 65 per cent off from retail prices, and for all cirs. pros. books, posters, &c., at cost.

was duly recorded in the office of the librarian of Congress; that thereafter, and on May 28, 1880, Thompson rendered to Hubbard Bros. a further instrument in writing, in the form of a bill of sale for the book, a copy of which was annexed to the bill and marked B, and was duly recorded in the office of the librarian of Congress, and was as follows:

"St. Louis, *May 3d*, 1880.

"Messrs. Hubbard Bros., Philadelphia, Pa., bought of N. D. Thompson & Co.

"To complete set electrot. plates, stock book, copyright, originals of illustrations, and stamps for binding same. . . . . . . . . . . . . . . $4000 00
"Credit by amount deducted from bills in April.       500 00

"$3500 00;"

In consideration of the fulfilment [of the] foregoing covenants and agreements, Hubbard Bros. agree to purchase and do hereby purchase the plates of Manning's Stock Doctor, &c., as before described, paying for same $500 offset present ac.; $1000 by note at 8 mos.; $1000 note at 12 mos.; $1000 by note at 18 mos.; $500 by note at 24 mos. Notes bearing interest at 6 per cent per annum. They further agree to supply N. D. Thompson all he may order of books from said plates in 500 lots, with his exclusive imprint and copyright mark, at ten per cent advance on actual cost of manufacture, also cost of boxing and drayage, on 60 days by N. D. Thompson.

They further agree to supply N. D. Thompson their other books and bibles made for sale through and supplied to their branches, at a discount of 65 per cent from the retail prices of the same, granting him the exclusive right of sale of close books in Mo., (excepting six counties adjacent to Kansas City,) Ark., Texas, La., that part of Ky. and Tenn. lying west of the Tennessee River and So. Ill.

It is mutually agreed that each party to this contract shall be responsible to the other in the amt. of $1.00 per copy for each copy of exclusive or close books sold in the other's territory by the general agents or canvassing agents of the opposite party, and further, that all applications for agency of close or exclusive books outside the field of either shall be referred to the party having exclusive right of sale, and a charge of 50c. made for each application so referred. It is further agreed that, should N. D. Thompson go out of business, or for any reason cease to prosecute the sale of Manning's Stock Doctor, &c., then the right of sale in his exclusive field shall revert to Hubbard Bros. unless his successor shall prosecute the sale in like

that Hubbard Bros. paid Thompson in full for said book, plates, copyright, illustrations, and stamps, the consideration mentioned in said bill of sale, and thereby became the sole owners of said book and of the copyright therein, and thereupon employed many persons in the United States and Canada to sell the book by subscription, giving to them the exclusive right to sell the book within the geographical limits assigned to them respectively, and employed Thompson, among others, as one of their agents to sell the book in a large and valuable territory, within which he had the exclusive privilege of selling the book by subscription, and for that purpose of employing others to assist him; that Hubbard Bros. added to the book, and enlarged and improved it, and caused to be printed and bound a large number of copies, each copy having printed therein a notice of copyright, and expended large sums of money in doing so and in advertising the book in newspapers and by means of circulars and prospectuses; that, in June, 1881, Hubbard became, by purchase from Ayer, the sole proprietor of the book and the copyright of it; that Thompson in 1881 and 1882, with full knowledge of the premises, compiled, printed, published and sold, and was continuing to sell and offer for sale, a book entitled "The American Farmers' Pictorial Cyclopedia of Live Stock, embracing Horses, Cattle, Swine, Sheep and Poultry, including departments on Dogs and Bees; being also a complete Stock Doctor; combining the effective method of object-teaching with written instruction. Giving all the facts concerning the various breeds; characteristics and excellences of each; best methods of breeding, training, sheltering, stable management and general care; with specific directions how to buy and how to sell, including careful and illustrated analysis of the points of domestic animals,

---

manner as he would have done; the field on stock book to be the same as on H. Bros.' books, except the six counties in Missouri adjacent to Kansas City.

HUBBARD BROS.
N. D. THOMPSON.

Plates to be made collateral security for payment of notes.

H. BROS.

with all the diseases to which they are subject, how to know them, the causes, prevention, and cure, given in plain, simple language, free from technicalities, but scientifically correct, and prescribing remedies readily obtained and easily applied. Designed for the successful and profitable use of the American Farmer and Stock Owner. By Hon. Jonathan Periam, editor 'American Encyclopedia of Agriculture;' editor 'Prairie Farmer;' former editor 'Western Rural;' Member Illinois Department of Agriculture; first Superintendent of Agricultural Illinois Industrial University; Life Member American Pomological Society; author 'History Farmers' Movement;' 'Lessons for Life,' etc. etc.; and A. H. Baker, V. S. Veterinary Editor 'American Field;' Veterinary Surgeon Illinois Humane Society; Medalist of the Montreal Veterinary College; Member of the Montreal Veterinary Medical Association, etc. etc. With over 700 appropriate engravings. Saint Louis, Mo.: N. D. Thompson & Co. Publishers, 520, 522, and 524 Pine Street. 1882;" and that such book was an infringement on the Manning book, its materials being copied in great part therefrom, the combination and arrangement of them in the two books being similar in all material respects.

The bill prayed for an injunction, both preliminary and perpetual, to restrain Thompson from printing, publishing and selling, or offering for sale, any copies of the Periam and Baker book, and for an account of those published and sold, and for the payment of the damages suffered by Hubbard, and for general relief.

An application for a preliminary injunction was denied by the court, but it required Thompson to give a bond in $5000, to answer any damages that might be adjudged against him, and to keep an account of the books in question which he had sold or should sell.

On the 5th of February, 1883, Thompson filed an answer to the bill, in which he admitted that he was the owner of the manuscript of the Manning book, and obtained the copyright therefor. It alleged that said Exhibit A was not recorded in the office of the librarian of Congress until August 23, 1882; that, before March 30, 1880, Hubbard Bros., composed of

Hubbard and Ayer, entered into negotiations with Thompson to purchase from him the Manning book, including the copyright thereof, which was thereafter to be obtained, the originals of cuts, stamps for binding and plates for circulars; that, on the 30th of March, 1880, Thompson met Hubbard at the Union Depot in St. Louis, and there, and on the railroad train while passing, on that day, from St. Louis to East St. Louis, Thompson verbally agreed with Hubbard, for Hubbard Bros., on the basis for the future sale of said book, copyright, originals of cuts, plates and stamps; that such agreement for the sale, thereafter to be made, was on the terms that Thompson would sell to Hubbard Bros. the plates necessary for printing the books, including the copyright, originals of cuts, and stamps for binding, Thompson to have the right first to publish an edition of 2000 copies of the book, and then to deliver the plates, cuts and stamps, properly packed for shipping, at the Union Depot in St. Louis, and, in consideration thereof, Hubbard Bros. were to pay to Thompson $4000, and also to manufacture said book for him and deliver the same to him in St. Louis, at a less cost than that for which he was then manufacturing the book, agreeing to manufacture and deliver it to him in St. Louis for a less price than $1.10 per copy, and that the book so to be manufactured for and delivered to Thompson should in each copy contain the name of " N. D. Thompson & Co., publishers, St. Louis, Missouri," exclusive of the name of any other publisher, and should contain, on the proper page, the exclusive copyright notice of N. D. Thompson & Co., in accordance with the act of Congress; that Thompson would order delivery of the books in lots of 500 copies, Hubbard Bros. to have a reasonable time after the receipt of the order in which to have the books bound; that the books should be furnished to Thompson at a net price of 10 per cent in advance of the actual cost of manufacture, including boxing and drayage, and that Thompson should have the exclusive right to sell the book within the bounds of the following territory, namely, the States of Missouri, Arkansas, Indian Territory, Louisiana, Texas, Mississippi, and that portion of Iowa bounded on the north by the third tier of counties from the

Missouri line, and that part of Illinois, not including, but south of Rock Island and Will counties, constituting about three fourths of the State of Illinois, and also in that portion of Kentucky and Tennessee bounded on the east by the Louisville. and Nashville and the Nashville and Chattanooga railroads, and also a portion of the State of Indiana ; that Thompson, having agents and canvassers engaged in selling the book on subscription for future delivery, in Iowa, Wisconsin, Michigan, Illinois and Ohio, at places and covering territory not included in that before mentioned, should continue to sell the book by such agents and canvassers then in his employ, in such territory then occupied by them; that Hubbard Bros. also agreed with Thompson that they would sell and furnish to him all other books and publications manufactured or issued for sale by them, through their house or branch offices, at a discount of 65 per cent off from the retail price of the same, and that he should have the exclusive right to sell said books and publications of Hubbard Bros. in Missouri, (excepting the six counties adjacent to Kansas City,) and also in Arkansas, Texas, Louisiana, that part of Kentucky and Tennessee lying west of the Tennessee River, and the southern half of Illinois ; that Hubbard Bros. would supply to him all circulars, prospectus books, and posters necessary and usual in prosecuting the sale of said books, at the cost price thereof, payment to be made for the same, and for said publications of Hubbard Bros., by Thompson, within sixty days from the date of sale ; that a contract and agreement should be written in proper form, and executed by Thompson and Hubbard Bros., in accordance with and on the considerations aforesaid, and that in such contract Thompson would agree, for two years from its execution, to publish no books other than such as he then had in course of publication, and devote his attention largely to the sale of such publications of Hubbard Bros., to be so purchased from them, and to push the sale thereof exclusively, except as to publications of Thompson ; that each party to the contract so to be entered into would pay to the other $1 per copy for each copy of the Manning book sold by either in any of the territory to be so reserved and exclusively set apart for the other;

that all applications for agencies for the sale of any of the said books, coming to one of the parties from territory reserved exclusively for the other, should be by such party referred to the other; that the party to whom such application should be referred would pay to the other 50 cents for every such application; that, if Thompson should go out of business or cease to prosecute the sale of the Manning book, then, unless the successor of Thompson would continue the same, Hubbard Bros. should have the exclusive right to sell said book; and that, on the execution of such contract, Thompson would assign the copyright to Hubbard Bros., and they would execute a mortgage to him on such plates, cuts and stamps, to secure to him the performance of the contract.

The answer further alleged that the $4000 so to be paid by Hubbard constituted only a small portion of the consideration of the contract to be made; that the plates, cuts and stamps were of greater value than $10,000 ; that Hubbard, falsely pretending to have made a memorandum in writing, with pencil, on paper, containing an outline of the terms and considerations of the contract thereafter to be entered into, a copy of which memorandum written by Hubbard is Exhibit A to the bill, represented to Thompson that such memorandum was incomplete, but contained the outlines of the contract thereafter to be made in accordance with such full understanding of the parties, and promised that he would prepare a contract in proper form, in writing, and elaborate the same in accordance with such considerations, and that Hubbard Bros. would execute it; that thus, by fraud and deceit, Hubbard persuaded Thompson to sign, with a pencil, such memorandum, Thompson at the time believing and relying on such false promises and representations of Hubbard; and that such memorandum was not agreed upon as, or understood or intended to be, the contract to be entered into by Thompson and Hubbard Bros., nor was it understood as, or intended to be, an assignment of the copyright of the book.

The answer further averred that Thompson, believing that Hubbard Bros. would in good faith execute the contract as agreed to be made and carry out the same in accordance with

the terms so agreed upon, shipped and delivered to Hubbard Bros. the plates, cuts and stamps necessary for the manufacture of the book, and, at the request of Hubbard or of Hubbard Bros., forwarded to them the paper marked Exhibit B to the bill, which was intended to be only a statement of the account of a part of the consideration to be rendered by Hubbard Bros., namely, $4000 which was to be paid in money; that Hubbard Bros. thereafter refused to carry out any part of the contract as agreed upon, and had refused to furnish Thompson with copies of the Manning book at the price agreed upon, or at any price less than the usual and regular wholesale price thereof, and had refused to manufacture for, or deliver to, Thompson any copy of said book, containing the copyright notice of him or of N. D. Thompson & Co., in accordance with the statute, and, having published editions of the book, had sold it in the territory exclusively to be reserved and set apart to Thompson; that Hubbard thereupon declared that there was no agreement or contract in existence between Hubbard Bros. and Thompson, and Thompson assented thereto; that thereby said agreement for said contract, and the terms of said contract, were by mutual consent rescinded; and that Hubbard Bros. did not, in each or any copy of the book, have printed any legal notice of copyright. The answer denied that the defendant, by publishing and selling the Periam and Baker book, has infringed any copyright belonging to Hubbard in the Manning book.

A replication was filed to this answer, on the 23d of February, 1883.

On the 10th of May, 1883, Thompson filed in the same court his cross-bill against Hubbard, setting forth that, having procured to be compiled the Manning book, and being its owner, he, on the 27th of March, 1880, before the manuscript of it was completed, and before the book was published, deposited in the mail, addressed to the librarian of Congress, at Washington, a printed copy of the title of the book, which was received by such librarian; and that, having thereafter published the book, he did, within ten days from its publication, deposit in the mail, addressed to such librarian, at Washington,

two complete printed copies thereof, of the best edition issued, and did print in each copy of said book published by him, on the page next after the title-page, a notice of copyright, in accordance with the statute, and so became the owner of the copyright of the book, and received from said librarian a certificate of the copyright thereof.

The cross-bill contained in substance the same allegations as are found in Thompson's answer to the original bill, in regard to the negotiations between the parties and the terms of the verbal agreemen, alleged by Thompson to have been made between them. It alleged that during the conversation at St. Louis, and while crossing to East St. Louis, each of the parties had in his hands a written paper, both of which were produced by Hubbard at the time; that, during the consideration of such writings, Hubbard made or pretended to make some alterations in the one held by him, which instrument and alterations Thompson did not at the time examine or read; that neither of the writings was at the time altered to correspond with the verbal agreement, and the two writings were not at the time compared, and the alterations so made in the one held by Hubbard were not made in the one held by Thompson; that afterwards Hubbard proposed to insert, and did insert, in said writings the clause, "Plates to be made collateral security for payment of notes;" that that clause was not in accordance with the agreement then and there made, it having been agreed that the plates should be collateral security for the performance of the verbal agreement; that afterwards, and when the train was about to leave East St. Louis, where Thompson was to leave it and return to St. Louis, Hubbard, representing to Thompson that the writings were incomplete, but that they contained the outlines of the contract thereafter to be made, and promising that he would prepare in proper form, in writing, a contract, and elaborate it in accordance with the verbal agreement and the considerations before set forth, and that Hubbard Bros. would execute it, and representing and promising that the said writings would be used only as a guide and outline, from which the real agreement would be drawn and framed in accordance with the full

understanding of the parties as so set forth, persuaded Thompson to sign, with a pencil, the writing attached to the original bill as Exhibit A; that, immediately on the return of Hubbard to Philadelphia, Hubbard Bros. caused their agents to be instructed to observe the boundary lines of the territory reserved to Thompson in said verbal agreement, as territory which had been reserved exclusively to Thompson thereby; that Thompson did not at the time see or know that the following clause in the writings was contained therein, namely, "The field on stock book to be the same as on H. Bros.' books except the six Co.'s, in Mo. adjacent to Kansas City," and did not discover the same until a day or two after he had signed the memorandum; that that clause was inserted by Hubbard without the knowledge and consent of Thompson, and Thompson never agreed or intended to agree to the same; that immediately after he discovered that clause in the writing retained by him, a copy of which writing is contained in the margin,[1]

---

[1] MEMORANDUM OF AGREEMENT.

N. D. T. agrees to sell H. Bros. the plates (1000 p.) of Manning's Stock Dr., etc., including copyright, the originals of cuts, stamps for binding and circular plates, for $4000, and deliver same soon as first edition now printing is off press, well boxed, at depot in St. Louis, free of charge for boxing and drayage.

He agrees further to pay for all books manufactured from said plates upon his order (with his exclusive imprint and copyright mark); to order not less than 500 at a time, and sixty days, and in time to admit of their being bound, after receipt by Hubbard Bros. of his order. He agrees to pay for all books he orders made from said plates, a net price of ten per cent in advance of cost of manufacture, including boxing and drayage.

He further agrees to confine his sales to the following territory, viz: the States of Missouri, Arkansas, Indian Territory, Louisiana, Texas, Mississippi, Southern Illinois, one third of each Indiana, Kentucky, Tennessee.

He further agrees, for the period of two years, to publish no books, except those he now has in course of publication, viz.: Texas History, Almanac, and the Tice Almanac, and to devote his energies largely for the above period to the vigorous prosecution of the sale of the publications (books and bibles) of Hubbard Bros., and to theirs exclusively (including bibles), (aside from his own, as named), paying for the same within sixty days of date of bills, at the rate of sixty-five per cent off from the retail prices, and for all circulars, prospectus books, posters, etc., at cost.

In consideration of the fulfilment of the foregoing covenants and agree-

he and Hubbard Bros. had a correspondence in relation to the
territory to be reserved to him, in which he insisted upon the
territory described in such verbal agreement, as that agreed
upon between Hubbard Bros. and himself to be reserved to
him, except as afterwards mentioned in the cross-bill; that, on
the 13th of April, 1880, he proposed, by way of concession to
Hubbard Bros., that instead of the territory agreed to be
reserved by the verbal agreement, the territory to be reserved
by the contract to be made should be as follows: The two
southern tiers of counties in Iowa, instead of three, as in said
verbal agreement provided as aforesaid; Illinois, south of and
including the counties of Henry, Bureau, LaSalle, Grundy and
Kankakee; none in Indiana, instead of a third of it; the
boundary line in Kentucky to be the Louisville and Nashville

---

ments, H. Bros. agree to purchase and do hereby purchase the plates of
Mf'g. Stock Dr., etc., as before described, paying for the same as follows,
viz.: $500 in present stock accounts unsettled, and $500 24 months; $1000
by note at 8 months; $1000 by note at 12 months; $1000 by note at 18
months, notes bearing interest at 6 per cent per annum.

They further agree to supply N. D. T. all he may order of books from
said plates in 500 lots, with his exclusive imprint and copyright mark, at 10
per cent advance on actual cost of manufacture, (said cost to include box-
ing and drayage,) and for cash on receipt of goods by N. D. T.

They further agree to supply N. D. T. such of their other publications,
(books and bibles, as are issued for sale through their home and branch
offices,) at a discount of 65 per cent off the retail price of the same, grant-
ing him the exclusive right of sale of close books in Mo., (excepting six
counties adjacent to Kansas City,) Ark., Texas, La., that part of Ky. and
Tenn. lying west of the Tenn. River, and So. Ill.

It is mutually agreed, that each party to this contract shall be responsi-
ble to the other in the amount of $1 per copy for any close or exclusive
books sold upon the territory of the other, and that all applications for
agency coming from without the field of either shall be referred to the
party having right of sale, and a charge of 50 cents made for each applica-
tion so referred.

It is further agreed, that should N. D. T. go out of business, or for any
reason cease to prosecute the sale of Manning's Stock Dr., then the right of
sale in his exclusive field shall belong to H. Bros., unless his successor shall
prosecute the sale in like manner.

The field on Stock Book to be same as on H. Bros.' book, except as to six
Co.'s adjacent to Kansas City. Plates to be made collateral security for
payment of notes.

HUBBARD BROS.

Railroad, and, in Tennessee, the Nashville and Montgomery Railroad; none of Alabama, instead of half of it, as in said verbal agreement provided; and the whole of Missouri, Arkansas, Texas, Louisiana, and Mississippi, and of the Indian Territory; and that Thompson should have the right to work out agencies made outside the field thus reserved prior to the acceptance by Hubbard Bros. of the proposal last aforesaid; that Hubbard Bros. on the 16th of April, 1880, declined such proposition, and made a counter proposition to Thompson which he, on the 20th of April, 1880, declined to accept; that Thompson then proposed that if the Iowa and Illinois territory, which he reserved in such proposition, should be conceded to him, he would agree to the proposition of Hubbard Bros. to make the territory to be reserved to him in Kentucky and Tennessee all that lying west of the Tennessee River, the other territory to be the same as in his said proposition; that Hubbard Bros. on the 20th of April, 1880, proposed to accept the proposition last aforesaid of Thompson if Thompson would relinquish the outside agencies, meaning those agencies not within the territory reserved and to be reserved to Thompson under his two propositions last aforesaid; that Thompson refused to relinquish said outside agencies at once, but, on the 20th of April, 1880, proposed so to do by the 15th of July following, provided Hubbard Bros. would accept his proposition of the 13th of April, 1880, as modified by his subsequent propositions aforesaid; that afterwards, and on the 20th of April, 1880, and on the 24th of April, 1880, Hubbard Bros. accepted the last aforesaid proposition of Thompson, and any agreement then existing between Hubbard Bros. and Thompson, if not originally such as Thompson had averred, was modified in accordance with said propositions and the acceptance thereof; that, between the 4th and 28th of May, 1880, Thompson shipped and caused to be delivered to Hubbard Bros. the plates, cuts, and stamps, necessary for the manufacture of the Manning book; that on the 26th of May, 1880, Hubbard Bros. requested Thompson to send them a bill specifying the electrotype plates, copyright, original wood engraving, electrotypes of illustrations, and stamps for binding; that,

on the 28th of May, 1880, he forwarded to them the written paper marked Exhibit B to the original bill; that, on June 1, 1880, Hubbard Bros. sent to him notes for the $3500 of the money part of the consideration, having theretofore allowed him $500 on current account; that, on the 22d of July, 1880, Hubbard Bros. sent to him a draft in writing of a contract prepared in more regular form, a copy of which was annexed to the cross-bill, and which, it is alleged, was materially different from either of the said purported memoranda of agreement, and from the said verbal agreement; that Thompson did not execute that draft; that, on the 2d of August, 1880, he prepared a draft of a contract, the provisions of which were substantially the same as those of the verbal agreement as so modified, except that he made in it certain alterations, by way of concessions in favor of Hubbard Bros.; that he sent it to Hubbard Bros., but they refused to execute it; and that afterwards there was further dispute over the territory to be reserved, and on other points.

The cross-bill further alleged the bringing and pendency of the original bill, and stated its contents and the proceedings which had taken place in the court in the original suit, and alleged that Thompson was still the owner of the Manning book and the copyright thereof; and that Hubbard, ever since he obtained possession of said property, had been and then was publishing and selling the book without any legal copyright notice therein, in the field which was to have been reserved exclusively to Thompson, and thus had been and was then infringing the copyright of Thompson in the Manning book, and threatened to continue to do so.

The cross-bill tendered to Hubbard the sum of $4000 so paid by Hubbard Bros. to Thompson, with interest at the rate of 6 per cent per annum from the time it was paid, upon the condition that Hubbard Bros. should surrender to Thompson the plates, cuts and stamps for the Manning book, and such other and further or different conditions as the court might order, and prayed for a perpetual injunction to restrain Hubbard from publishing, selling, or offering for sale, any copies of the Manning book, and for an account of all copies of it

published or sold, or to be published or sold by Hubbard, and for the payment to Thompson by Hubbard of all damage for an unlawful publication by Hubbard of the Manning book, and for a decree that Hubbard deliver back the plates, cuts and stamps, on such conditions as the court might order.

On the 19th of October, 1883, Hubbard filed an answer to the cross-bill, reaffirming the matter set forth in his original bill, and averring that all communications in reference to the delivery of things purchased and payment therefor, between Thompson and Hubbard, were in writing; that the efforts made between the parties to agree upon a more perfect draft of the agreement of March 30, 1880, failed, and therefore both parties to it fell back upon its provisions; that the covenants of that agreement, in reference to the sale of the Manning book and its purchase by Hubbard, were fully complied with, and the terms and conditions of the sale were never called in question or made matter of dispute, until after Thompson had completed and published his infringing book; that the covenants in that agreement with reference to the mode of doing business between Hubbard and Thompson were subsequently modified by correspondence, so that Thompson was enabled to order books in less quantities than 500 copies at a time, and on shorter notice than had been provided in the agreement of March 30, 1880; that, in consideration of such variance, Thompson agreed that the books furnished to him in smaller quantities and on shorter notice should be charged at the rate of 65 per cent off the retail price; that there was some correspondence on the question of territory, and also in reference to the covenants in the agreement of March 30, 1880, by which Thompson agreed, for the period of two years from that date, to publish no other book or books than those mentioned in the agreement, and to devote his energies largely, for the period of two years, to the vigorous prosecution of the sale of Hubbard Bros.' publications, and to them exclusively; that it was agreed by both parties, in that correspondence, that the adjustment of such matters in dispute should be made the subject of a personal conference between the parties, at the time of a proposed visit of Thompson to Philadelphia, and it was also

agreed that at such conference the matter of the price at
which Hubbard would agree to furnish the Manning books
to Thompson in smaller quantities and at shorter notice than
was provided in the agreement, should be settled finally; that
it was agreed between Thompson and Hubbard that the con-
tract between them was that the price to be paid by Hubbard
for "complete electrotype plates, Stock Book, copyright, origi-
nals of illustrations, and stamps for binding" was $4000; that
the considerations for the covenant on the part of Thompson,
that he would for two years publish no books except "Texas
History, Almanac, and the Tice Almanac," and would devote
his energies largely for two years to the vigorous prosecution
of the sale of Hubbard's books exclusively, paying for the
same within sixty days from date, all bills at the rate of 65
per cent off from retail prices, and for all circulars, prospec-
tuses, posters, etc., at cost, were the granting of the exclusive
right of sale of Hubbard's "close" books within the territory
mentioned, and the agreement to furnish the Manning books
in lots of 500 at an advance of 10 per cent on actual cost of
manufacture, upon the further terms and conditions contained
in the agreement of March 30, 1880; that, after Thompson
had completed the delivery of the electrotype plates, illustra-
tions, stamps, etc., and Hubbard had given to Thompson his
promissory notes, the sale of the Manning book to Hubbard
was complete, and the agreement providing for the sale and
mode of payment was of no further legal effect than as an
instrument in writing conveying the copyright, and the cove-
nants providing for the regulation of the business of the publi-
cation and sale of books between the parties, which were
executory and were to continue for the period of two years,
remained in force, subject to modifications from time to time
made and agreed to by the parties; that, notwithstanding the
failure of Thompson to order books in accordance with the
terms of the contract, Hubbard filled all orders for books
made on him by Thompson, imposing the condition, neverthe-
less, that, until Thompson would bring himself under the
terms of the contract of March 30, 1880, Hubbard would
charge the Manning books to Thompson at 65 per cent off

from the retail price, upon condition, however, that if Thompson would subsequently, upon his promised visit to Philadelphia, put himself upon the covenants of said contract, and show a willingness to perform them, Hubbard would abate the price at which the books were charged; that Thompson assented to such a course of dealing; that it was not true that the correspondence between the parties had reference to the contract of sale of the Manning books, plates, cuts, stamps, and copyright; that such contract of sale was not at any time spoken of as annulled, withdrawn, or rescinded, and no words were used in reference thereto which could be considered by Thompson to be a rescission, or an implied rescission, or an intended rescission of the contract; that Thompson and Hubbard at all times considered the sale of the Manning book, including plates, cuts, copyright, etc., and the payment therefor, as complete, when the promissory notes were forwarded to Thompson by Hubbard; and that such sale was treated as conclusive, complete, and absolute, by Thompson and Hubbard, until after Thompson had published the Periam and Baker book, and it was only then that Thompson began to dispute the title of Hubbard in the Manning book and the copyright thereof.

A replication was filed to the answer to the cross-bill, proofs were taken on both sides, and it was stipulated between the parties that all proof taken in either suit might be used in both.

The case was brought to a hearing before Judge Treat, the district judge, and on the 8th of July, 1885, he made a decision, holding, that if the copyright of the Manning book had been transferred to Hubbard, the Periam and Baker book was an infringement of it, but ordering a re-argument before the circuit judge (Judge Brewer) and himself, on three questions: (1) Whether Thompson assigned the copyright of the Manning book to Hubbard, so that Hubbard could pursue him for an infringement; (2) whether, if such assignment was made, it was rescinded; (3) whether, inasmuch as the imprint of Hubbard's publication did not conform to the terms of the statute, he could maintain an action against Thompson for an infringe-

ment, although Thompson knew that the copyright had been granted.

The case was heard before the two judges, and was decided in an opinion given by Judge Brewer, and reported in 25 Fed. Rep. 188. The view of the court was, that the testimony left the matter much in doubt, whether the paper signed on March 30, 1880, was understood by the parties to be a definite and closed contract, "or a mere preliminary statement — a memorandum of matters upon which they had agreed, and which, with all unsettled details, were thereafter to be put into the form of a complete contract in writing and then signed and executed." The conclusion of both judges was stated to be, that there was not in the testimony that which enabled the court to say that the parties, in respect to all the items of the proposed agreement between them, ever came to a definite understanding; that there were still some matters unsettled and undetermined, so that a contract, as it was a single contract and understood to be a single contract, could not be said to have been finally and definitely consummated; that the cross-bill ought to be sustained so far as concerned the tender — that is, the plates ought to be returned to Thompson upon the payment by him to Hubbard of the $4000 and interest, but that, so far as any claim by Thompson for an accounting and damages was concerned, the course of dealing between the parties had been such that equitably Thompson was not entitled to any such accounting.

On the 27th of October, 1885, a decree was made, entitled in both suits, adjudging that no assignment or sale of the copyright of the Manning book, or of the electrotype plates, originals of illustrations, and stamps for binding, was ever made by Thompson to Hubbard, by virtue of the instruments of writing and acts mentioned and described in the original bill, and that Hubbard neither acquired nor had any title to or ownership in the copyright of said book under said instruments and acts, or any of them, and dismissing the original bill; and it was decreed under the cross-bill, that Thompson was and always had been the owner of the copyright, electrotype plates, originals of illustrations, and stamps for binding,

of the Manning book, and that Hubbard, on the tender to him of $4000 with interest from May 15, 1880, to the date of the tender, should, on demand, surrender and deliver back to Thompson the electrotype plates, originals of illustrations, and stamps for binding, pertaining to said book and received by him from Thompson; that, if such tender should not be accepted, then said sum and interest should be paid into the registry of the court, to abide its further order; that Thompson was not equitably entitled to an accounting and damages; and that each party should pay his own costs. From this decree each party appealed to this court.

*Mr. J. B. Henderson*, for Thompson, cited: (1) As to the character and rescission of the contract: *Bruce* v. *Pearson*, 3 Johns. 534; *Innis* v. *Roane*, 4 Call, (Va.) 379; *Hazard* v. *New England Ins. Co.*, 1 Sumner, 218; *Dodge* v. *Hopkins*, 14 Wisconsin, 630; *Green* v. *Wells*, 2 California, 584; *Babcock* v. *Huntington*, 9 Alabama, 869; *Jennings* v. *Gage*, 13 Illinois, 610; *S. C.* 56 Am. Dec. 476; *Tisdale* v. *Buckmore*, 33 Maine, 461; *Cocke* v. *Rucks*, 34 Mississippi, 105; *Evans* v. *Gale*, 17 N. H. 573; *S. C.* 43 Am. Dec. 614; *Harris* v. *Bradley*, 9 Indiana, 166; *Smethurst* v. *Woolston*, 5 W. & S. 106; *Lucy* v. *Bundy*, 9 N. H. 298; *Allen* v. *Webb*, 24 N. H, 278; *Preble* v. *Bottom*, 27 Vermont, 249; *Wright* v. *Haskell*, 45 Maine, 489; *Young* v. *Wakefield*, 121 Mass. 91; *Steam Packet Co.* v. *Sickles*, 10 How. 419; *Bank of Columbia* v. *Hagner*, 1 Pet. 455. (2) As to the notice of the copyright by Thompson: *Burrow-Giles Lithographic Company.* v. *Sarony*, 111 U. S. 53; *Jollie* v. *Jaques*, 1 Blatchford, 618; *Baker* v. *Taylor*, 2 Blatchford, 82; *Parkinson* v. *Laselle*, 3 Sawyer, 330; *Boucicault* v. *Hart*, 13 Blatchford, 47; *Ewer* v. *Coxe*, 4 Wash. C. C. 487; *Rubber Company* v. *Goodyear*, 9 Wall. 788; *Wheaton* v. *Peters*, 8 Pet. 59; *Callaghan* v. *Myers*, 128 U. S. 617, 652; *Merrell* v. *Tice*, 104 U. S. 557; *Struve* v. *Schwedler*, 4 Blatchford, 23; *Banks* v. *Manchester*, 128 U. S. 244.

*Mr. J. R. Sypher, Mr. S. M. Breckinridge* and *Mr. John G. Johnson*, for Hubbard, cited. (1) As to the contract: *Laver*

*v. Dennett,* 109 U. S. 90; *Hartshorn* v. *Day,* 19 How. 211; *Nash* v. *Towne,* 5 Wall. 689; *Slater* v. *Emerson,* 19 How. 224; *Brawley* v. *United States,* 96 U. S. 168; *Chicago* v. *Sheldon,* 9 Wall. 50; *Farmers' Bank* v. *Groves,* 12 How. 5; *Warren* v. *Leland,* 2 Barb. 613; *Mallory* v. *Mackaye,* 12 Fed. Rep. 328; *Pulte* v. *Derby,* 5 McLean, 328; *Smoot's Case,* 15 Wall. 36; *Preston* v. *Luck,* 27 Ch. D. 497; *Kennedy* v. *Lee,* 3 Meriv. 440; *Darlington Iron Co.* v. *Foote,* 16 Fed. Rep. 646; *Bean* v. *Clark,* 30 Fed. Rep. 225; *Wheeler* v. *New Brunswick Railroad Co.,* 115 U. S. 29. (2) As to the copyright: *Wheaton* v. *Peters,* 8 Pet. 591; *Parkinson* v. *Laselle,* 3 Sawyer, 330; *Baker* v. *Taylor,* 2 Blatchford, 82; *Myers* v. *Callaghan,* 5 Fed. Rep. 726; *Story's Executors* v. *Holcombe,* 4 McLean, 306; *Chappelle* v. *Davidson,* 2 Kay & Johns. 123; *Bogue* v. *Houlston,* 5 DeG. &. S. 267; *Alexander* v. *McKenzie,* 9 Scotch Sess. Cas. 2d Series, 758; *Emerson* v. *Davies,* 3 Story, 768.

MR. JUSTICE BLATCHFORD, after stating the case, delivered the opinion of the court.

We are unable to concur in the conclusion of the Circuit Court on the question of the sale by Thompson to Hubbard of the copyright of the Manning book.

The price of the book and its copyright, including originals of cuts, circulars, plates and book stamps, having been fixed by agreement at $4000, the disputed point in the negotiations of March 30, 1880, was as to the extent of territory to be allowed to Thompson for the sale of the Manning book, he insisting upon being allowed more territory than was specified in the draft agreements produced by Hubbard. The two drafts, one of which was retained by each party, differ practically only as to the amount of territory in which Thompson was to be allowed to sell the Manning book. The two instruments agree as to the territory in which Thompson was to have an exclusive right to sell the other publications of Hubbard.

The two parties differ in their testimony as to what was

agreed upon in regard to the clause which is substantially the same in both of the instruments, namely: "The field on stock book to be the same as on H. Bros.' books except the six counties in Missouri adjacent to Kansas City," Hubbard testifying that his copy represented exactly what had been settled upon, and that the concluding paragraph was added to make everything certain, while Thompson testifies that he supposed the concluding sentence was added to express the understanding about the plates being collateral security for the notes which were to be given, although the special provision about the collateral security was inserted in the paper retained by him, as well as in that which he signed.

The two papers agree in providing for the sale to Hubbard of the plates of the Manning book, including copyright, the originals of cuts, the stamps for binding, and the plates for circulars, for $4000, the same to be delivered, well boxed, at the depot in St. Louis, free of charge for boxing or drayage, as soon as the first edition, then printing, should be off the press. They also agree in stating that Thompson should pay for all books which should be manufactured from the plates upon his order, with his exclusive imprint and copyright mark, if ordered in lots of not less than 500 at a time, payable in cash in 60 days, the price to be 10 per cent in advance of the cost to Hubbard Bros. of their manufacture, and also the further cost of boxing and drayage.

The two papers also agree in providing that, for the period of two years, Thompson would publish no books except those he then had in course of publication, namely; Texas History, Almanac and the Tice Almanac, and would devote his energies largely for that period to the vigorous prosecution of the sale of the publications (books and bibles) of Hubbard Bros., and theirs exclusively, (including bibles,) aside from his own, as named, paying for the same within sixty days of date of bills, at the rate of 65 per cent off from the retail prices, and for all circulars, prospectus books, posters, etc., at cost.

The two papers also agree in the time and manner of payment, in cash and in notes, for the plates and copyright.

The two papers also agree in providing that Hubbard Bros.

should supply Thompson with all books he might order from such plates in 500 lots, with his exclusive imprint and copyright mark, at 10 per cent advance on the actual cost of manufacture, also the cost of boxing and drayage, to be paid in cash on the receipt of the goods by Thompson; and in the statement that Hubbard Bros. would supply Thompson with their other books and bibles at a discount of 65 per cent from the retail prices of the same, and that they granted him the exclusive right of the sale of their "close" books in certain specified territory; and in stating that each party should be responsible to the other in the amount of $1 per copy for any "close" or exclusive books sold in the territory of the other, and that all applications for agency coming from without the field of either should be referred to the party having the exclusive right of sale, and a charge of 50 cents be made for each application so referred, and that, if Thompson should go out of business, or for any reason cease to prosecute the sale of the Manning book, the right of sale in his exclusive field should revert to Hubbard Bros., unless his successor should prosecute the sale in like manner as he would have done.

Afterwards, in correspondence with Hubbard, Thompson insisted upon being allowed a larger territory for the sale of the Manning book than that specified in the paper he had signed. Hubbard insisted that the provision which appears in both of the papers, "The field on stock book to be the same as on H. Bros.' books except the six counties in Missouri adjacent to Kansas City," specified the territory which had been settled upon. Thompson also, in a letter to Hubbard, desired a date to be fixed for the notes and for the commencement of the two years of his exclusive right in the Hubbard books. As to those matters, Hubbard replied that the date of the notes and the commencement of the two years would properly be fixed as of the date of the delivery of the plates. The dispute about the territory to be allowed to Thompson in respect to the Manning book continued, but was finally settled in a correspondence which occurred in April, 1880, and such settlement resulted in the shipment of the plates by Thompson to Hubbard, and in the payment of the consideration therefor,

by $500 of cash and $3500 in notes, the longest of which ran for two years from the 15th of May, 1880, and all of which were duly paid.

Thompson testifies that he shipped the plates because he and Hubbard had come to an agreement as to territory; and he also sent to Hubbard the bill of sale before set forth as a part of the original bill.

In enclosing to Thompson, on the 1st of June, 1880, the notes amounting to $3500, Hubbard wrote to him as follows: ".We enclose herewith notes to the amount of $3500, which, with $500 allowed you on book account, is in full settlement of your bill of May 3d for plates, copyright, original cuts and stamps for binding, of Manning's Illustrated Stock Doctor and Live Stock Encyclopedia. The first lot of plates did not reach us till about the 12th, second lot about the 18th, and third lot is not in yet, so we date notes the 15th, which is sooner than is really due you. Please acknowledge receipt in full and oblige." The notes were all of them dated May 15, 1880, and each of them bore interest at 6 per cent per annum, the three $1000 notes being payable respectively at 8, 12 and 18 months after date, and the $500 note at two years after date. Thompson, in a letter to Hubbard Bros., dated June 4, 1880, acknowledged the receipt of the four notes, and said: "With $500 previously allowed, they are payment in full of plates, engravings, copyright and all the material that enter into the manufacture of the Stock Book. The reservation being that we control certain field, and are to get books at a certain rate above actual cost of manufacture."

The draft of an agreement which Hubbard sent to Thompson in July, 1880, related only to future deliveries of the Manning book, to the territory in which it was to be sold by Thompson, and to the exclusive agency by Thompson for the publications of Hubbard. It did not mention the sale of the plates or the copyright, or the consideration therefor, because that had been settled by the bill of sale and the delivery of the notes; and it fixed the territory in which the Manning book was to be sold by Thompson, according to the limits which had been settled upon by the compromise of April,

1880. Up to July, 1880, after the compromise of April, 1880, no controversy had arisen in regard to any copies of the Manning book ordered by Thompson, because he had ordered none, having on hand the edition which he had printed before he delivered the plates to Hubbard. The draft agreement prepared by Thompson and sent by him to Hubbard in August, 1880, differed in matters which Hubbard considered material, from the draft agreement sent by Hubbard to Thompson in July, 1880.

We are of opinion that the transaction between the parties in regard to the sale of the copyright of the Manning book and the plates therefor, was a completed transaction, independently of all contracts or agreements in regard to other matters, that the consideration therefor was paid, and that that contract was never rescinded.

The remark made by Hubbard, in his letter to Thompson of August 12, 1880, "I am quite agreeable to your view that there is virtually no agreement between us," had reference to matters other than the sale of the copyright and the plates, which had passed to Hubbard, and which he had in his possession, and for which he had paid partly in cash and partly in the negotiable promissory notes of Hubbard Bros. There was no idea on the part of either party that the copyright and the plates were to be reconveyed to Thompson, or that he was to repay the consideration to Hubbard. Neither party suggested anything of the kind. Hubbard was publishing the book and pushing its sale, and Thompson, in and after the fall of 1880, was buying from Hubbard and paying for such copies of the Manning book as he desired to sell. The real dispute between the parties was as to the extent to which Thompson should be bound to exert himself in selling Hubbard's other publications, and should be restricted in selling any other publications than the three specified in the paper of March 30, 1880, and the point which concerned the matter of the sale of Hubbard's publications for two years had become unimportant when the original bill was filed, because that time had then expired.

The preparing and publishing by Thompson of the Periam and Baker book was entirely inconsistent with the idea that

he still owned the copyright of the Manning book. At the time the original bill was filed, Hubbard had fully performed his agreement to furnish the Manning book to Thompson as Thompson ordered it, had respected the territory allotted to Thompson, and had shipped his other publications to Thompson as demanded. On these facts, there could be no revesting in Thompson of the title to the copyright and the plates, and all that he could ever have a right to, growing out of the failure by Hubbard to perform any agreements which he had entered into, was a remedy by damages in an action at common law, or a remedy by a bill in equity for specific performance, on the basis of the existence of the actual agreement made.

The remaining question is as to whether Hubbard, as the owner of the copyright of the Manning book, can maintain his suit against Thompson for its infringement.

The following statement is made in the brief by Hubbard: "It is conceded that plaintiff's book was duly entered for copyright; that before publicat on a printed copy of the title of the book was delivered at the office of the librarian of Congress at Washington; that, within ten days after publication, two complete copies of the best edition of the book were delivered at the office of the librarian of Congress at Washington; and that on the page next after the title-page there was printed, in every copy of the first edition of the book, notice of copyright in the following words, viz.: 'Entered according to act of Congress, in the year 1880, by N. D. Thompson & Co., in the office of the Librarian of Congress, at Washington.' It is also conceded that, after Mr. Thompson had delivered the electrotype plates of the book to Hubbard Brothers, they changed the form of the copyright notice so as to read as follows, viz.: 'Entered according to Act of Congress,' in which form the notice was printed in the copies of several editions, and that afterward plaintiff again changed the notice of copyright so as to read as follows: 'Copyright, 1880,' in which last mentioned form the notice was printed in the copies of several editions."

One of the forms used by Hubbard did not state either the year in which the copyright was entered, or by whom it was

entered; while the other form mentioned the year but not the name.

Section 4962 of the Revised Statutes provides as follows: "No person shall maintain an action for the infringement of his copyright unless he shall give notice thereof by inserting in the several copies of every edition published, on the title-page or the page immediately following, if it be a book; or if a map, chart, musical composition, print, cut, engraving, photograph, painting, drawing, chromo, statue, statuary, or model or design intended to be perfected and completed as a work of the fine arts, by inscribing upon some portion of the face or front thereof, or on the face of the substance on which the same shall be mounted, the following words: 'Entered according to act of Congress, in the year ——, by A. B., in the office of the Librarian of Congress at Washington.'"

Section 1 of the act of June 18, 1874, c. 301, 18 Stat. 78, which act took effect on and after August 1, 1874, provides as follows: "That no person shall maintain an action for the infringement of his copyright unless he shall give notice thereof by inserting in the several copies of every edition published, on the title-page or the page immediately following, if it be a book; or if a map, chart, musical composition, print, cut, engraving, photograph, painting, drawing, chromo, statue, statuary, or model or design intended to be perfected and completed as a work of the fine arts, by inscribing upon some visible portion thereof or of the substance on which the same shall be mounted, the following words, viz.: 'Entered according to act of Congress, in the year ——, by A. B., in the office of the Librarian of Congress, at Washington;' or, at his option the word 'Copyright,' together with the year the copyright was entered, and the name of the party by whom it was taken out; thus — 'Copyright, 18—, by A. B.'" The 4th section of the same act repealed all laws and parts of laws inconsistent with the provisions contained in the first three sections of the act.

It is very clear that Hubbard, as the proprietor of the copyright, was bound to give the statutory notice in the several copies of every edition published by him, and that

he did not do so. The plain declaration of the statute is, that no person shall maintain an action for the infringement of *his* copyright, unless he shall give notice thereof by inserting the prescribed words in the several copies of every edition published. That means, every edition which he, as controlling the publication, publishes. His failure to give such notice debars him from maintaining an action for the infringement of *his* copyright. The word " action " means an action either at law or in equity.

Section 3 of the act of May 31, 1790, c. 15, 1 Stat. 125, declared that no person should be entitled to the benefit of that act, unless he should first deposit a printed copy of the title of a book in the prescribed office; and further provided that the author or proprietor should, within a prescribed time, cause a copy of the record of the title to be published in one or more newspapers, as prescribed.

Section 1 of the act of April 29, 1802, c. 36, 2 Stat. 171, provided that every person who should seek to obtain a copyright of a book should, in addition to the requisites enjoined in the act of 1790, give information, by causing the copy of the record to be inserted at full length in the title-page, or in the page immediately following the title of the book.

Section 5 of the act of February 3, 1831, c. 16, 4 Stat. 437, declared that no person should be entitled to the benefit of that act, unless he should insert the prescribed words in the published copies of the book. In section 97 of the act of July 8, 1870, c. 230, 16 Stat. 214, now section 4962 of the Revised Statutes, the language of section 5 of the act of 1831 was changed so as to declare that no person should maintain an action for the infringement of his copyright, unless he should insert in the several published copies the notice prescribed. This requirement of giving the prescribed notice has always been held, under all of the statutes, to be one of the conditions precedent to the perfection of the copyright, the other two being the deposit, before publication, of the printed copy of the title, and the depositing in the public office, within the prescribed time after publication, of a copy or copies of the book. *Wheaton* v. *Peters*, 8 Pet. 591; *Merrell* v. *Tice*, 104 U. S. 557; *Callaghan* v. *Myers*, 128 U. S. 617, 652.

It is not enough that Thompson, while he owned the copyright, gave the required notice in the copies of every edition he published, while it was *his* copyright. The inhibition of the statute extended to and operated upon Hubbard while he owned the copyright, in respect to the copies of every edition which he published, and for his failure he is debarred from maintaining his action.

The view is urged, that the only object of the notice required by the statute is to give notice of the copyright to the public; and that, as Thompson himself took the copyright, and had vested the title to it in Hubbard, he has no right to infringe the copyright, although it may be invalid as to the rest of the world. But we are of opinion that the failure of Hubbard to comply with the statute operated to prevent his right of action against Thompson from coming into existence. This right of action, as well as the copyright itself, is wholly statutory, and the means of securing any right of action in Hubbard are only those prescribed by Congress. *Wheaton* v. *Peters*, 8 Pet. 591, 662, 663 ; *Banks* v. *Manchester*, 128 U. S. 244, 252.

*The decree of the Circuit Court is reversed, and the case is remanded to that court with directions to dismiss the original bill and the cross-bill, with costs in the Circuit Court to neither party. Each party is to pay one half of all the costs in this court.*