UNITED STATES of America, Appellee,

v.

Joseph SILVANO, Jr.,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

William. P. McNEILL,
Defendant, Appellant.

Nos. 86–1460, 86–1488.

United States Court of Appeals,
First Circuit.

Argued Jan. 5, 1987.

Decided March 4, 1987.

---

Ellen Y. Suni with whom Jack I. Zalkind, Boston, Mass., was on brief, for Joseph Silvano, Jr.

Morris M. Goldings with whom Richard S. Jacobs and Mahoney, Hawkes & Goldings, Boston, Mass., were on brief, for William P. McNeill.

Michael Loucks, Asst. U.S. Atty., with whom Robert S. Mueller, III, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before BOWNES, Circuit Judge, ROSENN,* Senior Circuit Judge, and SELYA, Circuit Judge.

ROSENN, Senior Circuit Judge.

An official of the City of Boston and his friend, an insurance agent, were convicted in the United States District Court of conspiracy, extortion, and multiple counts of mail fraud arising out of a scheme to defraud the City and its citizens in connection with the city employees health insurance program. They appeal their convictions based on (1) the scope and requirements of the federal mail fraud statute, 18 U.S.C. § 1341; (2) the district court's instructions on that statute; and (3) the district court's characterization of statements otherwise hearsay as admissible coconspirator statements under Fed.R.Evid. 801(d)(2)(E). Be-

*Of the Third Circuit, sitting by designation.

cause we agree with the district court's analysis of the mail fraud statute and conclude that the disputed statements were properly admitted into evidence, we affirm.

### I.

William P. McNeill, one of the defendants, was the Acting Budget Director for the City of Boston in 1979 and 1980. As Budget Director, he was responsible for the operations of Boston's budget division, including authority for personnel changes with significant impact and for approval of all no-bid contracts awarded by the City. He was regarded as one of the "principal financial operatives" in the City's administration and had access to the Mayor on all financial matters. His friend and co-defendant, Joseph Silvano, Jr., was an insurance agent with many contacts around City Hall. In 1979 and 1980, Silvano owned two insurance companies, which were doing poorly.

Boston for years had had a fixed premium health insurance contract with Blue Cross of Massachusetts, Inc. and Blue Shield of Massachusetts, Inc. (Blue Cross) for its employees. The City's Group Insurance Department, through its insurance coordinator, Leo Ronan, usually was responsible for selecting the carrier and implementing the programs. McNeill took no part in the process except in 1980.

In late 1979 or early 1980, Silvano and two other insurance agents, James O'Leary and Robert Poitras, got together and submitted a cost plus reinsurance proposal to the City on behalf of American Health and Life Insurance Co. (AHL). Only Blue Cross and AHL submitted bids by the closing date of April 28, 1980. Leo Ronan and his assistant, Ernest Romani, also met with Silvano and Poitras to discuss concerns about their capability to perform, as by June 1980 they had no office, computer, or staff. When Romani mentioned these concerns to McNeill, McNeill said he would "take care of it." The health insurance contract was awarded to AHL on June 30, 1980, as the lowest bidder. The parties,

however, wrote the contract in the name of Tamarack Management Corp., a third-party administrator of health plans, of which Poitras was president.

Following the opening of bids on April 28, 1980, Blue Cross applied pressure, primarily through the employees' labor unions, to have the City retain its insurance with Blue Cross. Blue Cross also sought a meeting with those in the City administration who possessed the decision-making power over the health insurance contract and who were responsible for its award. As a result of its activities, Blue Cross was ultimately referred to McNeill, who, it was told, played a major role in the City's award of the insurance contract. On July 2, 1980, McNeill and four Blue Cross representatives met at McNeill's office. McNeill asked if he were among friends and indicated that he expected confidentiality in their conversations. He told them that Blue Cross "could perhaps still have the contract if we could overcome some problems." First, he mentioned that the City would face a cancellation penalty of $400,-000 to $600,000 if it cancelled the Tamarack policy in favor of Blue Cross stating that Tamarack had invested that much in cranking up to handle the business.[1] The other problem McNeill presented to Blue Cross involved Silvano. He informed the Blue Cross representatives that Silvano was the City's consultant, who had spent considerable time analyzing the bids and would be submitting a bill for about $94,000. McNeill suggested that Blue Cross increase its administrative charge to the City by that amount and pay it to Silvano. Blue Cross refused to comply with either of these demands, despite their understanding that by so doing they would lose the insurance contract. Following renewed and vigorous union pressure, the City withdrew the contract from AHL and Tamarack and

partially awarded the contract to Blue Cross on July 2, 1980.[2]

Following the aborted effort to obtain the $94,000 payment for Silvano and the insurance contract for him and his coterie, McNeill attempted to get the City to award Silvano a retroactive no-bid contract for $90,000 for alleged consultations in the City's selection of a health insurer. Both Silvano and McNeill spoke to several city officials in this effort. McNeill personally escorted the consulting proposal through the Boston Financial Commission (Fincom). He sent a memorandum to the Commission stating that Silvano's services had saved the City between 2 and 2.5 million dollars. After meeting with and securing approvals from Assistant Corporation Counsel Kelam Derdarian, the City Auditor, the City Treasurer, and Fincom, McNeill took the proposed award to Corporation Counsel Harold Carroll. He brought with him a statement of hours Silvano supposedly already had worked for the City. That document showed that Silvano had spent 1,063.5 hours on consulting work for the City between August 6, 1979, and April 28, 1980, at a time when he was putting together the AHL bid, and including many hours his secretary later testified that he was on vacation, out sick, or on other business. Silvano also mailed Carroll a copy of his "report" reflecting his alleged work for the City. Carroll told McNeill that he thought Silvano had a potential conflict of interest because of his work in behalf of the AHL contract at a time when he purported to act as the City's consultant. Despite another meeting with both McNeill and Silvano to discuss the conflict, Carroll refused to approve the award.

McNeill and Silvano next undertook a third and successful initiative to obtain a portion of the City's health insurance business for some entity with which Silvano was involved. After AHL lost the con-

1. Poitras testified that there were no such expenses, and that he had never discussed cancellation penalties with Silvano, McNeill, or any other city employee.

2. Initially, Blue Cross was notified that the entire insurance contract had been awarded to it. However, a letter dated a few days later signed by McNeill notified it that the City had elected only to place the cost reimbursement or third-party administrative portion of the health insurance contract with Blue Cross and that it would be purchasing the remainder of the insurance coverage elsewhere.

tract, Silvano communicated with Robert Tierney, Vice President for Group Insurance of Boston Mutual Life Insurance Co. He asked for Tierney's help in placing the reinsurance portion of the City's contracts. Tierney recommended that the program be partially self-funded, which would require a claims monitoring service such as Consultants and Risk Managers, Inc. (CRM).

Silvano met with Robert Shea, President of CRM and Embassy Insurance Agency, and told him how he had been able to obtain the City's health insurance contract for AHL but that they had lost it due to union pressure. He now sought Shea's aid to obtain just the reinsurance portion of the City's health insurance contract. After a further discussion Shea agreed with Silvano to give him fifty percent of the profits if Silvano would help him get the contract. Silvano told him that they would have to go through McNeill to obtain the business, but that McNeill was his friend.

The two met with McNeill, and Shea told McNeill he and Silvano were in business together to get part of the City's health insurance contract. Shea also told McNeill (and no other city employee) that Silvano would get money under the Embassy/CRM proposal. McNeill pushed a no-bid award letter through for the City to employ CRM to provide claims monitoring and other services connected with the self-funding portion of the City's health insurance contract and to assist in selection of the reinsurance. On July 11, 1980, McNeill wrote Blue Cross notifying them that Embassy and CRM would provide the reinsurance coverage and that Blue Cross would receive only the administrative portion of the City's health insurance contract.

Assistant corporation counsel Derderian received a first draft of the CRM award letter on July 28, 1980, which named Silvano as "the City's insurance consultant." The letter also noted that utilizing the recommendation of the City's consultant, it was decided "to establish a self insurance fund with the participation of Blue Cross-Blue Shield." Before approving the letter, he and Corporation Counsel Carroll met

with Shea and Shea's employee, Peter Cook, neither of whom mentioned Silvano's concealed interest in the CRM contract.

McNeill submitted a final draft of the CRM award letter to Derderian containing no references to recommendations by Silvano. In securing approval from Carroll, Derderian, and Fincom he never mentioned Silvano's 50% interest in the proposed contract. Similarly, McNeill lobbied for the support of the City Treasurer and the City Auditor for both the Silvano consulting award and the CRM claims monitoring award without mentioning Silvano's interest. All these City employees testified that they would not have approved the award if they had known of Silvano's interest.

The City ultimately approved the CRM and Embassy contract. After 1982, the reinsurance was moved to Boston Mutual. Embassy provided administrative and underwriting services, receiving a twenty percent commission—double the normal amount—from Boston Mutual, which was passed along to the City in higher premiums. The Embassy and CRM contracts were extended for a three-year period. Over the life of these contracts, the City paid Embassy and CRM nearly $8 million for claims monitoring services and a reinsurance premium. Silvano's 50% of the profits came to $2,034,881.41.

The grand jury based the twenty-three mail fraud counts on various letters, checks, and memoranda. Count 2 rested upon a letter from William Clifford, a Blue Cross employee, to McNeill confirming that the City's arrangement with Blue Cross was for administrative services only. The jury acquitted both McNeill and Silvano on this mail fraud count.

Counts 3 through 10 were based on mailings from the Moulton Insurance Agency (Moulton), an insurance agent in Massachusetts for Employers Reinsurance Corporation (ERC), to its principal in Kansas City, enclosing the City's monthly premium payments (drawn on an Embassy Insurance Agency account) for the cost of the City's reinsurance policy. Count 11 is based on a letter from McNeill to a Blue Cross employee directing Blue Cross to work with

Embassy with respect to the City's health insurance. Count 12 is predicated on the memorandum of report Silvano mailed to Carroll depicting the consulting work he had allegedly performed on the City's behalf. Count 13 is bottomed on a letter from ERC in Kansas City to Moulton discussing the rate to be charged and the premiums to be paid. Counts 14 through 23 are based on the mailings from ERC in Kansas City to its agent Moulton in Massachusetts which contained Embassy's commission payments for the reinsurance contract placed with the City. From these premium checks, and from the payments made by the City directly to CRM, Embassy paid to Silvano his fifty percent share of the profits.

The jury convicted McNeill on twenty-one counts of mail fraud, one count of extortion, and one count of conspiracy. It convicted Silvano on twenty-one counts of mail fraud and one count of conspiracy.

## II.

■ The defendants contend on appeal that Congress did not intend to extend the mail fraud statute, 18 U.S.C. § 1341,[3] to local political matters, absent a particular federal interest. They assert that the purpose of the statute was to curb swindles and securities fraud, not corruption in local government. Application of the mail fraud statute to this case, which as they see it involves "only a tenuous or contrived connection to federal law" is, they urge, well beyond the contemplation of Congress and contravenes the basic principles of federalism and criminal law. See, e.g., Coffee, The Metastasis of Mail Fraud: The Continuing Story of the "Evolution" of White-Collar Crime, 21 Am.Crim.L.Rev. 1, 14–17 (1983); Baxter, Federal Discretion in the Prosecution of Local Political Corruption, 10 Pepperdine L.Rev. 321 (1983).

Use of federal criminal jurisdiction to attack local political corruption destroys local autonomy and responsibility, argue the defendants. The primary responsibility for ferreting out political corruption "must rest, until Congress directs otherwise, with the State," United States v. Craig, 528 F.2d 773, 779 (7th Cir.), cert. denied, 425 U.S. 973, 96 S.Ct. 2171, 48 L.Ed.2d 796 (1976), and federal intervention places essentially state responsibility in the hands of federal officials. Federal officials remote from local interests would have the task of policing the fiduciary relationship between local government employees and their constituents. The line between acceptable and improper conduct is so fine, they contend, that absent a strong federal interest, the use of the mail fraud statute to prosecute political corruption is an improper exercise of federal power and an unreasonable and unauthorized judicial extension of the statute.

The Supreme Court rejected this federalism argument long ago. Badders v. United States, 240 U.S. 391, 393, 36 S.Ct. 367, 367–68, 60 L.Ed. 706 (1916) (Whatever the limits to its power, Congress may forbid putting letters into the post office when such acts are "done in furtherance of a scheme that it regards as contrary to public policy, whether it can forbid the scheme or not."). See also Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960). This court has specifically stated that Congress enacted the mail fraud statute to protect the integrity of the mails and that it reaches use of the mails "to implement fraudulent schemes directed at a state agency." United States v. Rendini, 738 F.2d 530, 533 (1st Cir.1984). See also United States v. Mandel, 591 F.2d 1347 (4th Cir.), aff'd in relevant part, 602 F.2d 653 (1979) (in banc), cert. denied, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980); United States v. States, 488 F.2d 761 (8th

---

**3.** 18 U.S.C. § 1341 provides in pertinent part: Whoever, having devised or intending to devise any scheme or artifice to defraud, ... places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, ... shall be fined not more than $1,000.00 or imprisoned not more than five years, or both.

Cir.1973), *cert. denied*, 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974).

At least four other courts of appeals have held that the mail fraud statute proscribes use of the United States mails in furtherance of schemes to defraud citizens of their "intangible rights to honest and impartial government." *United States v. Gray*, 790 F.2d 1290, 1294 (6th Cir.1986). *See, e.g., United States v. Von Barta*, 635 F.2d 999, 1005–06 (2d Cir.1980), *cert. denied*, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981); *United States v. Mandel, supra; United States v. Keane*, 522 F.2d 534 (7th Cir.1975), *cert. denied*, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976); *United States v. States, supra*, 488 F.2d at 766. This interpetation is premised upon an underlying theory that a public official acts as "trustee for the citizens and the State ... and thus owes the normal fiduciary duties of a trustee, e.g., honesty and loyalty" to them. *Mandel*, 591 F.2d at 1363; *Gray*, 790 F.2d at 1294. The Fourth Circuit in *Mandel* noted that "there can be no real contention that many schemes to defraud a state and its citizens of intangible rights, e.g., honest and faithful government, may not fall within the purview of the mail fraud statute." 591 F.2d at 1362. Although there is some authority criticizing an expansive reading of § 1341, *United States v. McNeive*, 536 F.2d 1245 (8th Cir. 1976); *United States v. Rabbitt*, 583 F.2d 1014, 1024–26 (8th Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979), the law is well established that the mail fraud statute proscribes use of the mails to defraud a state and its citizens.

### III.

▪ The defendants next contend that even if the mail fraud statute is applicable, the Government has failed to meet the requirements of the statute. First, they argue that a scheme to defraud cannot be shown by the defendants' mere failure to disclose material information respecting Silvano's interests. They draw a distinction between active and passive concealment of material facts with respect to prosecution under section 1341 and assert that

there was no evidence that anyone ever asked McNeill about Silvano's interest in the contract and that there is no evidence of any attempt on his part to hide this information. Nondisclosure, without more, they urge, "is beyond the pale of a cognizable 'scheme to defraud.'" There must be, they argue, a *deliberate concealment* of facts, citing *United States v. Mandel, supra*, 591 F.2d at 1364. We disagree. We need not decide whether this record shows a deliberate concealment of material facts by Silvano because the affirmative duty to disclose material information arises out of a government official's fiduciary relationship to his or her employer, whether as a public or as a private employee. *United States v. Bush*, 522 F.2d 641, 646 (7th Cir.1975), *cert. denied*, 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976); *see also United States v. Keplinger*, 776 F.2d 678, 697–98 (7th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986). Although not all dishonest or disloyal conduct by an employee violates the mail fraud statute, an employee's breach of a fiduciary duty falls within the strictures of the statute when it encompasses the breach of a duty to disclose material information to the employer. *United States v. Newman*, 664 F.2d 12, 19 (2d Cir.1981), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983). Concealment of material information by an employee under a duty to disclose to his or her employer "under circumstances where the non-disclosure could or does result in harm to [the employer] is a violation of the [mail fraud] statute." *United States v. Bronston*, 658 F.2d 920, 926 (2d Cir.1981), *cert. denied*, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982). Thus, we hold that where a person occupies a fiduciary relationship to the City, as McNeill did in this case, and is aware of material information pertaining to the expenditure of large sums of the City's monies on an unnecessary project, or one which will secretly enrich another at the expense of the City, that person has an affirmative duty to disclose the information.

▪ Second, the defendants argue that the Government did not prove that the only

public official involved, McNeill, in any way personally profited from his activities with respect to the City's health insurance contract. It is immaterial whether McNeill personally profited from the scheme or whether the City suffered a financial loss from it. *See United States v. Lemm,* 680 F.2d 1193, 1205 (8th Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983); *cf. United States v. Louderman,* 576 F.2d 1383, 1387 (9th Cir.1976) (wire fraud), *cert. denied,* 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978); *see United States v. Newman, supra* at 20. The loss to the City of McNeill's good faith services alone establishes the breach.

In the case at bar, McNeill falsely represented Silvano as the City's consultant and failed to disclose Silvano's interest in the contracts. He lobbied for the City's approval and also used his position to attempt to extort money from Blue Cross for Silvano. These actions establish a breach of his fiduciary duty to the City and its citizens.

■ The defendants also contend that the indictment and evidence are insufficient to establish use of the mails in violation of the terms of the mail fraud statute. They argue that neither Silvano nor McNeill placed or received any of the mailings. The success of the scheme did not depend on the mailings and they were neither an essential nor integral part of the scheme to defraud. Citing *United States v. Maze,* 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974), they therefore assert that the mailings proved by the Government do not satisfy the mailing requirements of the statute. *Maze,* however, does not require that the use of the mails be an essential element of the scheme, only that the mailings be made to execute it. *Id.* at 400, 94 S.Ct. at 648–49. A mailing need only be closely related to the scheme and reasonably foreseeable as a result of the defendant's actions. *Id.* at 399, 94 S.Ct. at 648; *United States v. Martin,* 694 F.2d 885, 890 (1st Cir.1982). Mailings of the proceeds of the fraud suffice. *Pereira v. United States,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954); *Martin, supra.*

The mailings supporting McNeill's and Silvano's convictions are not, as they assert, merely tangential. The mailings for counts 3 through 10 and 14 through 23, which involved payment of premiums and commissions, were all necessary for transmission of the proceeds of the fraud to Silvano. The mailing described in count 11 was a letter from McNeill to Blue Cross instructing it to work with Embassy. The defendants do not even dispute the centrality of the mailing in count 12, a memorandum from Silvano to Carroll.

In sum, the federal mail fraud statute sweeps broadly and its prohibitions extend to the use of the mails by corrupt local government officials. It is similarly settled that use of the mails need be no more central to the illegal scheme than were the mailings supporting the counts upon which McNeill and Silvano were convicted. We therefore reject the defendants' challenges to their convictions on these bases. Consistent with our rejection of the defendants' reading of the statute, we perceive no error in the district court's instructions to the jury. The court's instructions conformed to the law and to our reading of the statute. The defendants' proposed instructions did not.

## IV.

Federal Rule of Evidence 801(d)(2)(E) provides that "[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." In the present case, the Government offered against Silvano statements made by McNeill to the representatives of Blue Cross at their meeting on July 2, 1980. The district court admitted the statements against Silvano conditionally, subject to proof at trial by a preponderance of the evidence of the required foundation: that Silvano and McNeill were members of a conspiracy that existed at the time the statements were made and that the statements were made in furtherance of the conspiracy. *United States v. Petrozziello,* 548 F.2d 20 (1st Cir.1977). Without the admission of these statements, McNeill and

Silvano assert, there would have been an insufficient basis for a finding of a conspiracy as against Silvano, and therefore Silvano's subsequent acts and statements could not have been used as evidence of conspiracy as against McNeill.

After the close of all the evidence, the district court made its finding under *Petrozziello* that a conspiracy did exist at the time of the statements, and that they could therefore be admitted against Silvano. The court indicated that its finding was based both on the testimony of the statements itself and on independent evidence.

There is disagreement among the circuits whether statements sought to be introduced under Rule 801(d)(2)(E) may themselves be used to establish the existence of a conspiracy and thus to lay their own foundation. *See Means v. United States*, 469 U.S. 1058, 1061, 105 S.Ct. 541, 543, 83 L.Ed.2d 429 (1984) (White, J., dissenting) ("The critical question is whether a court may rely on challenged hearsay statements to determine whether the factual predicate for their admission exists.... The conflict shows no sign of disappearing, and I remain convinced that this Court should resolve it.").

The majority position is that such statements cannot be "bootstrapped" this way.[4] This court has not clearly stated whether or not it adopts the majority position. In *United States v. Nardi*, 633 F.2d 972, 974 (1st Cir.1980), the court ruled that coconspirators' statements are admissible if the court finds that "the existence of a conspiracy in which the defendant participated is established by a preponderance of *independent* evidence" (emphasis added). *See also United States v. Patterson*, 644 F.2d 890,

894 (1st Cir.1981) (independent evidence required). On the other hand, in *United States v. Martorano*, 561 F.2d 406 (1st Cir.1977), *cert. denied*, 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978), this court stated that the policies and terms of Federal Rule of Evidence 104(a) seem to favor the consideration of the challenged hearsay evidence in determining whether a conspiracy exists. It cautioned, however, against construing its opinion as deciding anything about the continued viability of the requirement that the proof of the existence of the conspiracy be independent of the challenged hearsay statements. *United States v. Johnston*, 784 F.2d 416, 422 n. 6 (1st Cir.1986). The issue is now pending before the Supreme Court. *United States v. Bourjaily*, 781 F.2d 539 (6th Cir.), *cert. granted*, —— U.S. ——, 107 S.Ct. 268, 93 L.Ed.2d 246 (1986). We neither decide this question today nor await the opinion of the Court on the point because we hold that on the record before us there is sufficient independent evidence that it was more likely than not that a conspiracy existed between Silvano and the declarant, and that the statements were in furtherance of the conspiracy, to permit their admission under Federal Rule of Evidence 801(d)(2)(E).

The Government concedes that there were only a few events prior to July 2, 1980, which support a finding of a conspiracy. There was the unsuccessful legitimate AHL bid for the contract in April 1980, which McNeill supported, and evidence that Silvano's secretary typed documents concerning the City's insurance program and made two separate deliveries of packets of papers to McNeill. The Government argues that although these acts were not themselves improper they

---

4. *See United States v. Jackson*, 627 F.2d 1198, 1214–15 (D.C.Cir.1980); *United States v. Alvarez-Porras*, 643 F.2d 54, 56–57 (2d Cir.), *cert. denied*, 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981); *Gov't of the Virgin Islands v. Dowling*, 633 F.2d 660, 665 (3d Cir.), *cert. denied*, 449 U.S. 960, 101 S.Ct. 374, 66 L.Ed.2d 228 (1980) (*but see United States v. Cryan*, 490 F.Supp. 1234, 1241 (D.N.J.), *aff'd*, 636 F.2d 1211 (3d Cir. 1980)); *United States v. Gresko*, 632 F.2d 1128, 1131–32 (4th Cir.1980); *United States v. James*, 590 F.2d 575, 580–81 (5th Cir.1979) (in banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61

L.Ed.2d 283 (1979); *United States v. Regilio*, 669 F.2d 1169, 1174 (7th Cir.1981), *cert. denied*, 457 U.S. 1133, 102 S.Ct. 2959, 73 L.Ed.2d 1350 (1982); *United States v. Bell*, 573 F.2d 1040, 1043–44 (8th Cir.1978) (*but see United States v. Howard*, 706 F.2d 267 (8th Cir.), *cert. denied*, 464 U.S. 934, 104 S.Ct. 341, 78 L.Ed.2d 309 (1983)); *United States v. Monaco*, 702 F.2d 860, 876–80 (11th Cir.1983). *But see United States v. Piccolo*, 723 F.2d 1234 (6th Cir.1983) (in banc), *cert. denied*, 466 U.S. 970, 104 S.Ct. 2342, 80 L.Ed.2d 817 (1984).

support a finding of concert of action with respect to the City's health insurance contracts.

■ In its *Petrozziello* analysis, the court is not limited to consideration of independent evidence of conspiracy that existed prior to the time of the challenged declaration. *See, e.g., Johnston,* 784 F.2d at 422–23; *Martorano,* 561 F.2d at 407–08. This is illustrated by this court's direction to the district courts to make the *Petrozziello* ruling at the close of all the evidence. *United States v. Patterson,* 644 F.2d 890, 896 (1st Cir.1981).

■ Evidence of events occurring after the meeting of July 2, 1980, does support the district court's finding that a conspiracy existed as of that date. The same day, immediately after the meeting between McNeill and the Blue Cross representatives, Silvano telephoned Shea, the President of CRM, and told him that AHL had lost the health insurance contract because of union pressure. Later, Silvano asked Robert Tierney, Vice President for Group Insurance of Boston Mutual Life Insurance Company, for assistance in placing the reinsurance portion of the City's health insurance contracts, implying that he had been informed that AHL had lost the main contract, but might still get the reinsurance portion. It was not unreasonable for the district court to infer from these statements to Shea and Tierney that Silvano had obtained his information from McNeill immediately after the July 2 meeting. There was also evidence that Silvano on several occasions had told Poitras, Romani, Shea, and Tierney that McNeill was his contact in City Hall.

After the July 2 meeting, Silvano and McNeill pursued the elusive consulting contract for Silvano. The amount sought, $90,000, approximated the $94,000 McNeill previously had suggested that the Blue Cross representatives pay Silvano. More important, the statement of the hours supposedly worked by Silvano for the City submitted as part of the no-bid award letter referred only to the period August 6, 1979, to April 28, 1980: all before July 2, 1980. Finally, unknown to any City official but McNeill, Silvano received fifty percent of the profits from the Embassy CRM reinsurance award about which he had supposedly advised the City as an independent consultant. Silvano had assured Shea that McNeill was his friend, and Shea had agreed to give Silvano the fifty percent share if he would help Shea get the contract.

Upon this independent evidence, we cannot say that the district court's inference that it was more likely than not that the conspiracy between McNeill and Silvano already existed on July 2, 1980, was unreasonable. We therefore conclude that the trial judge did not commit error in his *Petrozziello* ruling admitting the testimony of McNeill's statements at the July 2 meeting.

## V.

In sum, we hold that the federal mail fraud statute, 18 U.S.C. § 1341, does extend to schemes to defraud citizens of their rights to honest local government, and that the prosecution satisfied all the requirements of that statute. We also conclude that there was sufficient independent evidence of a conspiracy existing on July 2, 1980, to support the district court's ruling to admit McNeill's statements made that day in his meeting with Blue Cross representatives against Silvano as coconspirator statements under Federal Rule of Evidence 801(d)(2)(E).

Accordingly, the judgment of the district court is affirmed.