UNITED STATES of America

v.

David LaMACCHIA.

Crim. A. No. 94–10092–RGS.

United States District Court, D. Massachusetts.

Dec. 28, 1994.

**536**

Sharon Beckman, Andrew Good, Harvey A. Silverglate, Silverglate, Gertner, Fine & Good, David Duncan, Zalkind, Rodriquez, Lunt & Duncan, Boston, MA, for defendant.

Jeanne M. Kempthorne, U.S. Attorney's Office, Boston, MA, for U.S.

### MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS

STEARNS, District Judge.

This case presents the issue of whether new wine can be poured into an old bottle. The facts, as seen in the light most favorable to the government, are these. The defendant, David LaMacchia, is a twenty-one year old student at the Massachusetts Institute of Technology (MIT). LaMacchia, a computer hacker, used MIT's computer network to gain entree to the Internet. Using pseudonyms and an encrypted address, LaMacchia set up an electronic bulletin board which he named Cynosure.[1] He encouraged his correspondents to upload popular software applications (Excel 5.0 and WordPerfect 6.0) and computer games (Sim City 2000). These he transferred to a second encrypted address (Cynosure II) where they could be downloaded by other users with access to the Cynosure password. Although LaMacchia was at pains to impress the need for circumspection on the part of his subscribers, the worldwide traffic generated by the offer of free software attracted the notice of university and federal authorities.

On April 7, 1994, a federal grand jury returned a one count indictment charging LaMacchia with conspiring with "persons unknown" to violate 18 U.S.C. § 1343, the wire fraud statute. According to the indictment, LaMacchia devised a scheme to defraud that had as its object the facilitation "on an international scale" of the "illegal copying and distribution of copyrighted software" without payment of licensing fees and royalties to software manufacturers and vendors. The indictment alleges that LaMacchia's scheme

---

**1.** The allusion is presumably to the North Star, a faithful astronomical reference point for mari-    ners.

caused losses of more than one million dollars to software copyright holders. The indictment does not allege that LaMacchia sought or derived any personal benefit from the scheme to defraud.

On September 30, 1994, the defendant brought a motion to dismiss, arguing that the government had improperly resorted to the wire fraud statute as a copyright enforcement tool in defiance of the Supreme Court's decision in *Dowling v. United States*, 473 U.S. 207, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985). The government argues that *Dowling* is a narrower case than LaMacchia would have it, and holds only that copyright infringement does not satisfy the physical "taking" requirement of the National Stolen Property Act, 18 U.S.C. § 2314.

### THE DOWLING DECISION

Paul Edmond Dowling was convicted of conspiracy, interstate transportation of stolen property [ITSP], copyright violations and mail fraud in the Central District of California. Dowling and his co-conspirators sold bootleg Elvis Presley recordings by soliciting catalogue orders from post office boxes in Glendale, California. The infringing recordings were shipped in interstate commerce to Maryland and Florida. The eight ITSP counts on which Dowling was convicted involved thousands of phonograph albums. "[E]ach album contained performances of copyrighted musical compositions for the use of which no licenses had been obtained nor royalties paid...." *Dowling, supra* at 212, 105 S.Ct. at 3130. Dowling appealed his convictions (except those involving copyright infringement). The Ninth Circuit Court of Appeals affirmed. "[T]he [Ninth Circuit] reasoned that the rights of copyright owners in their protected property were indistinguishable from ownership interests in other types of property and were equally deserving of protection under the [stolen property] statute." *Id.*

The Supreme Court granted certiorari only as to Dowling's convictions for interstate transportation of stolen property.[2] The Court, in an opinion by Justice Blackmun,

held that a copyrighted musical composition impressed on a bootleg phonograph record is not property that is "stolen, converted, or taken by fraud" within the meaning of the Stolen Property Act. Justice Blackmun emphasized that cases prosecuted under § 2314 had traditionally involved "physical 'goods, wares [or] merchandise.'" The statute "seems clearly to contemplate a physical identity between the items unlawfully obtained and those eventually transported, and hence some prior physical taking of the subject goods" *Id.* at 216, 105 S.Ct. at 3133. In Dowling's case there was no evidence "that Dowling wrongfully came by the phonorecords actually shipped or the physical materials from which they were made." *Dowling, supra* at 214, 105 S.Ct. at 3132.

Justice Blackmun felt compelled, however, to answer the government's argument that the unauthorized use of the underlying musical compositions was itself sufficient to render the offending phonorecords property "stolen, converted or taken by fraud."

> [T]he Government's theory here would make theft, conversion, or fraud equivalent to wrongful appropriation of statutorily protected rights in copyright. The copyright owner, however, holds no ordinary chattel. A copyright, like other intellectual property, comprises a series of carefully defined and carefully delimited interests to which the law affords correspondingly exact protections. *Id.* at 216, 105 S.Ct. at 3133.

■ A copyright, as Justice Blackmun explained, is unlike an ordinary chattel because the holder does not acquire exclusive dominion over the thing owned. The limited nature of the property interest conferred by copyright stems from an overriding First Amendment concern for the free dissemination of ideas. "The primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.' Art. I, § 8, cl. 8." *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 349, 111 S.Ct. 1282, 1294, 113 L.Ed.2d 358 (1991). *Data General*

---

**2.** The Court observed a split among the Circuits concerning the applicability of 18 U.S.C. § 2314

to the interstate transportation of infringing articles.

*Corp. v. Grumman Systems Support,* 36 F.3d 1147, 1187 (1st Cir.1994) (same). Justice Blackmun offered the "fair use" doctrine (17 U.S.C. § 107) and the statutory scheme of compulsory licensing of musical compositions (17 U.S.C. § 115) as examples of ways in which the property rights of a copyright holder are circumscribed by the Copyright Act.[3] *Dowling, supra,* 473 U.S. at 217, 105 S.Ct. at 3133.

It follows that interference with copyright does not easily equate with theft, conversion or fraud. The Copyright Act even employs a separate term of art to define one who misappropriates a copyright: "Anyone who violates any of the exclusive rights of the copyright owner," that is, anyone who trespasses into his exclusive domain by using or authorizing the use of the copyrighted work in one of the five ways set forth in the statute, "is an infringer of the copyright." There is no dispute in this case that Dowling's unauthorized inclusion on his bootleg albums of performances of copyrighted compositions constituted infringement of those copyrights. It is less clear, however, that the taking that occurs when an infringer arrogates the use of another's protected work comfortably fits the terms associated with physical removal employed by § 2314. The infringer invades a statutorily defined province guaranteed to the copyright holder alone. But he does not assume physical control over the copyright; nor does he wholly deprive its owner of its use. While one may colloquially like infringement with some general notion of wrongful appropriation, infringement plainly implicates a more complex set of property interests than does run-of-the-mill theft, conversion, or fraud. As a result, it fits but awkwardly with the language Congress chose— "stolen, converted or taken by fraud"—to describe the sorts of goods whose interstate shipment § 2314 makes criminal. *Id.* at 217–218, 105 S.Ct. at 3133 (citations omitted).

The ITSP statute, Justice Blackmun observed, had its roots in efforts by Congress to supplement the efforts of state authorities frustrated by jurisdictional problems arising from the transportation of stolen property across state lines. *Id.* at 219–220, 105 S.Ct. at 3134–3135.

No such need for supplemental federal action has ever existed, however, with respect to copyright infringement, for the obvious reason that Congress always has had the bestowed authority to legislate directly in this area. . . . Given that power, it is implausible to suppose that Congress intended to combat the problem of copyright infringement by the circuitous route hypothesized by the government. . . . In sum, the premise of § 2314—the need to fill with federal action an enforcement chasm created by limited state jurisdiction—simply does not apply to the conduct the Government seeks to reach here. *Id.* at 220–221, 105 S.Ct. at 3135.

A review of the evolution of criminal penalties in the Copyright Act led Justice Blackmun to observe that:

"[T]he history of the criminal infringement provisions of the Copyright Act reveals a good deal of care on Congress' part before subjecting copyright infringement to serious criminal penalties. . . . In stark contrast, the Government's theory of this case presupposes a congressional decision to bring the felony provisions of § 2314, which make available the comparatively light fine of not more than $10,000 but the relatively harsh term of imprisonment of up to 10 years, to bear on the distribution of a sufficient quantity of any infringing goods simply because of the presence here of a factor—interstate transportation—not otherwise though relevant to copyright law. The Government thereby presumes congressional adoption of an indirect but blunderbuss solution to a problem treated with precision when considered directly. *Id.* at 225–226, 105 S.Ct. at 3137.

Finally, noting that the government's expansive reading of the Stolen Property Act would have the unsettling effect of criminalizing a broad range of conduct involving copyright and other intellectual property that had been historically regulated by the civil laws,

---

3. Another example is the finite duration of a copyright. See 17 U.S.C. § 302.

Justice Blackmun concluded that "the deliberation with which Congress over the last decade has addressed the problem of copyright infringement for profit, as well as the precision with which it has chosen to apply criminal penalties in this area, demonstrates anew the wisdom of leaving it to the legislature to define crime and prescribe penalties. Here, the language of § 2314 does not 'plainly and unmistakably' cover petitioner Dowling's conduct." *Id.* at 228, 105 S.Ct. at 3138–3139 (footnote omitted). Dowling's ITSP convictions were reversed.

## THE COPYRIGHT LAW

Article I, § 8, cl. 8 of the U.S. Constitution grants Congress the exclusive power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective writings and Discoveries." Thus "[t]he remedies for infringement 'are only those prescribed by Congress.'" *Sony Corporation of America v. Universal City Studios, Inc.,* 464 U.S. 417, 431, 104 S.Ct. 774, 783, 78 L.Ed.2d 574 (1984) (quoting *Thompson v. Hubbard,* 131 U.S. 123, 151, 9 S.Ct. 710, 720, 33 L.Ed. 76 (1889)). Since 1897, when criminal copyright infringement was first introduced into U.S. copyright law,[4] the concept differentiating criminal from civil copyright violations has been that the infringement must be pursued for purposes of commercial exploitation.

Until 1909, "[t]he crime of copyright infringement was ... limited to unlawful performances and representation of copyrighted dramatic and musical compositions." Saunders, *Criminal Copyright Infringement and the Copyright Felony Act,* 71 Denv.U.L.Rev. 671, 673 (1994). The 1897 Act defined the *mens rea* of criminal copyright infringement as conduct that is "willfull" and undertaken "for profit," a definition that remained unaltered until the general revision of the Copyright Act in 1976.

In 1909, the Copyright Act was revised to extend misdemeanor criminal sanctions to infringement of all copyrighted material with the exception of sound recordings. Copyright Act of 1909, ch. 320, 33 Stat. 1075–1082. The 1909 amendments also made criminal the knowing and willful aiding and abetting of another's infringing activities. Performers and producers of musical recordings were not protected under the 1909 Act, and composers were given the exclusive rights to license only the first recording of their musical works. After that, a compulsory licensing provision allowed anyone to record and distribute the work so long as a two cent per copy royalty was paid to the original composer. *Id.* §§ 1(e), 25(e).

The framework set out by the 1909 Act remained in effect until 1971, when the growth of the recording industry following the musical revolution of the 1960's brought the problem of unauthorized reproduction and sale of musical works to Congress' attention. See H.R.Rep. No. 487, 92d Cong., 1st Sess. 2 (1971). In response, Congress passed the Sound Recording Act of 1971, which addressed the perceived flaw in the 1909 Act by granting sound recordings full copyright protection, including criminal penalties for profit motivated infringement. In 1976, Congress revamped the Copyright Act by eliminating the crime of aiding and abetting copyright infringement. It also eased the *mens rea* requirement for criminal copyright infringement by eliminating the burden of proving that an infringer acted "for profit," requiring instead only that the infringement be conducted "willfully and for purposes of commercial advantage or private financial gain." 17 U.S.C. § 506(a). Criminal infringement under the 1976 Act was a misdemeanor except in the case of repeat offenders (who could be sentenced to a maximum of two years and a fine of $50,000).

After lobbying by the Motion Picture Association and the Recording Industry Association, Congress increased the penalties for criminal infringement in 1982. Act of May 24, 1982, Pub.L. No. 97–180, 97th Cong., 2d Sess., 96 Stat. 91. Certain types of first-time criminal infringement were punishable as felonies depending on the time period involved and the number of copies reproduced or dis-

---

4. Act of January 6, 1897, ch. 4, 29 Stat. 481–482.

tributed.[5] See 18 U.S.C. § 2319. The *mens rea* element, however, remained unchanged, requiring proof of "commercial advantage or private financial gain." 17 U.S.C. § 506(a). Most criminal infringements remained misdemeanor offenses despite the new penalty structure.

In the decade following the 1982 revisions to the Copyright Act, the home computing and software industry underwent a period of explosive growth paralleling the expansion in the 1960's and 1970's of the recording and motion picture industries. In 1992, the Software Publishers Association reported in testimony to the Subcommittee on Intellectual Property and Judicial Administration of the House Committee on the Judiciary that software manufacturers were losing $2.4 billion in revenues annually as a result of software piracy. "Rather than adopting a piecemeal approach to copyright legislation and simply adding computer programs to audiovisual works, and sound recordings to the list of works whose infringement can give rise to felony penalties under [18 U.S.C.] § 2319," Congress passed the Copyright Felony Act.[6] Saunders, *supra*, at 680. The Act amended § 2319 by extending its felony provisions to the criminal infringement of all copyrighted works including computer software.[7] The *mens rea* for criminal infringement remained unchanged, requiring prosecutors to prove that the defendant infringed a copyright "willfully and for purpose of commercial advantage or private financial gain." 17 U.S.C. § 506(a).[8]

---

**5.** While the offense of criminal copyright infringement remained defined by 17 U.S.C. § 506(a), the penalties were moved to a new freestanding statute, 18 U.S.C. § 2319.

**6.** Pub.L. No. 102–561 [S. 893] (October 28, 1992) (enacted after amendment). This is not to say that Congress had been inattentive to the needs of the emerging software industry. In 1980, Congress added "computer program" to the list of definitions of works protected under the copyright statute. See 17 U.S.C. § 101. The Computer Software Rental Amendments Act of 1990 gave further protection to holders of software copyrights, although declining to subject violators to the criminal penalties of 17 U.S.C. § 506 and 18 U.S.C. § 2319. See 17 U.S.C. § 109(b)(4).

## DISCUSSION

■ The wire fraud statute, 18 U.S.C. § 1343 was enacted in 1952. In its entirety, the statute reads as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

The wire fraud statute was enacted to cure a jurisdictional defect that Congress perceived was created by the growth of radio and television as commercial media. In its report to the House of Representatives, the Committee on the Judiciary explained:

> [T]he measure in amended form ... creates a new, but relatively isolated area of criminal conduct consisting of the execution of a scheme to defraud or to obtain money or property by means of false or fraudulent pretenses, representations, or promises transmitted in writings, signs, pictures, or sounds via interstate wire or radio communications (which includes the medium of television).... The rapid growth of interstate communications facili-

---

**7.** The Report that accompanied the Senate version of the bill declared that "[t]he *only* defense against [software] piracy is the copyright law." S.Rep. No. 268, 102d Cong., 2d Sess. (1992) (emphasis added).

**8.** As Senator Hatch, the Senate sponsor of the Act noted, "the copying must be undertaken to make money, and even incidental financial benefits that might accrue as a result of the copying should not contravene the law where the achievement of those benefits [was] not the motivation behind the copying." 138 Cong.Rec. S. 17958–17959 (October 8, 1992).

ties, particularly those of radio and television, has given rise to a variety of fraudulent activities on the part of unscrupulous persons which are not within the reach of existing mail fraud laws, but which are carried out in complete reliance upon the use of wire and radio facilities and without resort to the mails.... Even in those cases of radio fraud where the mails have played a role, it is sometimes difficult to prove the use of the mails to the satisfaction of the court, and so prosecutions often fail. Because of the greater facility in proving the use of radio, this bill if enacted might often rescue a prosecution which would otherwise be defeated on technicalities.

H.R.Rep. No. 388, 82d Cong., 1st Sess. 102 (1951).

■ As the legislative history makes clear, the wire fraud statute was intended to complement the mail fraud statute by giving federal prosecutors jurisdiction over frauds involving the use of interstate (or foreign) wire transmissions.[9] Thus what can be prosecuted as a scheme to defraud under the mail fraud statute (18 U.S.C. § 1341) is equally susceptible to punishment under § 1343 so long as the jurisdictional element is met. *Carpenter v. United States*, 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 320 n. 6, 98 L.Ed.2d 275 (1987). *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 n. 8 (1st Cir.1990). The concomitancy of the two statutes underlies the government's argument that significance should be read into the fact that the limited grant of certiorari in *Dowling* left Dowling's convictions for mail fraud undisturbed.

A scheme to defraud is the defining concept of the mail and wire fraud statutes. Because of the conjunctive use of the word "or" in the statutory phrase "any scheme or artifice to defraud, *or* for obtaining money or property by false or fraudulent pretenses, representations, or promises," the federal courts (encouraged by prosecutors) have essentially bifurcated mail and wire fraud into two separate offenses; the first, the devising of a scheme to defraud, the second, the devising of a scheme to obtain money or property by false pretenses. While the latter crime comports with common law notions of fraud, "[t]he phrase, 'a scheme to defraud' came to prohibit a plan, that is, to forbid a state of mind, rather than physical conduct." Moohr, *Mail Fraud and the Intangible Rights Doctrine: Someone to Watch Over Us*, 31 Harv.J. on Legis. 153, 161 (1994).

■ The incarnation of mail fraud as an inchoate crime has its most celebrated expression in federal prosecutions of state and local public officials accused of depriving citizens of their intangible right to honest public service in violation of their fiduciary duty to disclose conflicts of interest.[10] See *United States v. Mandel*, 591 F.2d 1347, 1360–1362 (4th Cir.1979). Because of the so-called "intangible rights doctrine," mail fraud and its sister offense, wire fraud, have become the federal prosecutor's weapon of choice. "Mail fraud ... has been expanded to the point that a fiduciary, agent, or employee commits an offense when, through a material deception or a failure to disclose a beneficiary, principal or employer suffers even an intangible, constructed detriment." Moohr, *supra*, 31 Harv.J. On Legis. at 163. Wire fraud offers an especially pleasing feature from the government's perspective that is particularly relevant to LaMacchia's case. Unlike the criminal copyright statute, 17 U.S.C. § 506(a), the mail and wire fraud statutes do not require that a defendant be shown to

---

**9.** The "interstate" limitation was inserted into the statute both out of jurisdictional concerns and to "avoid intrusion on the police power of the States." H.R.Rep. No. 388, *supra*, at 3. The police power of the States, of course, does not extend to the regulation of copyright, leading one to doubt, as defendant points out, that the statute was enacted to supplement state efforts to police copyright infringement. Defendant's Memorandum, at 18.

**10.** The origins and contours of the intangible rights doctrine (and the short-lived effort of the Supreme Court to reground the mail fraud statute in traditional concepts of property, see *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987)) are capably portrayed in Moohr, *supra*, 31 Harv.J. on Legis. at 158–170. The doctrine has been applied with similar effect to schemes arising in a commercial context. See *United States v. George*, 477 F.2d 508 (7th Cir.1973) (commercial kickbacks, employee's duty to disclose).

have sought to personally profit from the scheme to defraud. See *United States v. Silvano,* 812 F.2d 754, 759–760 (1st Cir.1987).

■ While it is true, as LaMacchia contends, that the denial of a writ of certiorari "imports no expression upon the merits of the case," *United States v. Carver,* 260 U.S. 482, 490, 43 S.Ct. 181, 182, 67 L.Ed. 361 (1923), the more interesting issue is whether the Ninth Circuit's mail fraud analysis (the significant portions of which the Supreme Court left intact) is applicable to the facts of his case.

Dowling brought himself within the orbit of the mail fraud statute by mailing catalogues advertising his bootleg phonograph records. So, too, the government argues, LaMacchia subjected himself to the wire fraud statute by advertising infringing software via computer transmissions. The government in *Dowling* (as here) did not argue any more than jurisdictional significance for Dowling's mailings, that is, the mailings themselves did not make any false or misleading representations. They did, however, serve as an obvious means of furthering Dowling's scheme to defraud. See *Schmuck v. United States,* 489 U.S. 705, 710–711, 109 S.Ct. 1443, 1447–1448, 103 L.Ed.2d 734 (1989).

The Ninth Circuit nonetheless focused on the fact that Dowling had "concealed his activities from the copyright holders with the intent to deprive them of their royalties." *United States v. Dowling,* 739 F.2d 1445, 1449 (9th Cir.1984). "It is settled in this Circuit that a scheme to defraud need not be an active misrepresentation. A nondisclosure or concealment may serve as a basis for the fraudulent scheme." *Id.* at 1448. See also *United States v. Silvano, supra,* 812 F.2d at 759 (same). The Ninth Circuit rejected Dowling's argument that non-disclosure can serve as the basis of a scheme to defraud only when a defendant has a fiduciary duty to make an affirmative disclosure. It also rejected the government's contention

that "the presence of illegal conduct alone may constitute the basis of the 'fraud' element." 739 F.2d at 1449. "Rather, we conclude that a non-disclosure can only serve as a basis for a fraudulent scheme when there exists an independent duty that has been breached by the person so charged." *Id.* This duty, the Ninth Circuit noted, could be fiduciary in nature, or it could "derive from an independent explicit statutory duty created by legislative enactment." *Id.* In Dowling's case, the duty located by the Ninth Circuit was the duty implicit in the compulsory licensing scheme of the Copyright Act, 17 U.S.C. § 115, which requires vendors to notify copyright owners of the intention to manufacture and distribute infringing records.

> In conclusion, we stress that the narrowness of our holding permits nondisclosures to form the basis of a scheme to defraud only when there exists an independent duty (either fiduciary or derived from an explicit and independent statutory requirement) and such a duty has been breached. To hold otherwise that illegal conduct alone may constitute the basis of the fraud element of a mail fraud conviction would have the potential of bringing almost any illegal act within the province of the mail fraud statute.

739 F.2d at 1450.

The difficulties in applying the Ninth Circuit's *Dowling* analysis to support a wire fraud prosecution in LaMacchia's case are three. First, no fiduciary relationship existed between LaMacchia and the manufacturers whose software copyrights he allegedly infringed. Second, there is no independent statutory duty of disclosure like the one that snared Dowling because there is no software equivalent to the compulsory licensing scheme.[11] Third, even were I to accept the argument made by the government in *Dowling,* that illegal conduct alone may suffice to satisfy the fraud element of [§ 1343], the holding would not cover LaMacchia's case for the simple reason that what LaMacchia is

---

11. In *Cooper v. United States,* 639 F.Supp. 176, 180 (M.D.Fla.1986), cited by the government, the petitioners did not raise the sufficiency of the allegation of a scheme to defraud, but rather the possibility that the jury might have perceived the

interstate transportation of the pirated cassette tapes as the gravamen of the scheme, a theory indisputably precluded by the Supreme Court's *Dowling* decision.

alleged to have done is not criminal conduct under § 506(a) of the Copyright Act.[12]

The government's second and more plausible argument relies on the unobjectionable proposition "that [the] enactment of particularized federal interest statutes does not oust a more general interstate commerce statute from application." Government's Memorandum at 11. The government cites a number of areas of specialized federal law where the mail and wire fraud statutes have been held to remain viable enforcement tools. This same argument, however, did not impress Justice Blackmun in *Dowling*, as none of the cases cited there (as here) "involved copyright law specifically or intellectual property in general." *Dowling, supra*, 473 U.S. at 218 n. 8, 105 S.Ct. at 3134 n. 8.[13] The government also points to 18 U.S.C. § 2319(a), which provides that "[w]hoever violates section 506(a) . . . of title 17 shall be punished as provided in subsection (b) of this section and such penalties shall be in addition to any other provisions of title 17 or any other law." The government emphasizes the last four words of the statute without apparently noticing the first four. LaMacchia is not alleged to have violated section 506(a). See also *Dowling, supra* at 225 n. 18, 105 S.Ct. at 3137 n. 18 ("In the absence of any such indication [that Congress intended to approve the use of § 2314 in a copyright prosecution], we decline to read the general language appended to § 2319(a) impliedly to validate extension of § 2314 in a manner otherwise unsupported by its language and purpose"). Finally, the government cites *Carpenter v. United States*, 484 U.S. 19, 108

S.Ct. 316, 98 L.Ed.2d 275 (1987), which holds that intangible as well as tangible property interests are protected by the mail and wire fraud statutes. "Absolutely nothing in [*Carpenter*]," the government argues, "distinguishes intangible rights to copy, distribute and license computer software from other intangible property interests. . . ." Government's Memorandum at 13. But see *United States v. Riggs*, 739 F.Supp. 414, 422–423 (N.D.Ill.1990) ("As *Dowling* . . . recognized, the copyright holder owns only a bundle of intangible rights which can be infringed, but not stolen or converted. The owner of confidential, proprietary business information, in contrast, possesses something which has clearly been recognized as an item of *property* ").

■ The issue thus is whether the "bundle of rights" conferred by copyright is unique and distinguishable from the indisputably broad range of property interests protected by the mail and wire fraud statutes. I find it difficult, if not impossible, to read *Dowling* as saying anything but that it is.[14] "A copyright, like other intellectual property, comprises a series of carefully defined and carefully delimited interests to which the law affords correspondingly exact protections." *Dowling, supra* 473 U.S. at 216, 105 S.Ct. at 3133. If, as the government contends, *Dowling* stands for nothing more than the proposition that one cannot equate copyright infringement with a "physical taking" for purposes of the Stolen Property Act,[15] it is difficult to explain why Justice Blackmun devot-

---

12. I do not believe that the Ninth Circuit's mail fraud analysis survives *Dowling* in any event, as I will explain. Dowling, I note, did not contest his conviction for criminal violations of § 506(a) of the Copyright Act.

13. The suggestion that the felony provisions of the wire fraud statute were enacted with the punishment of copyright infringement in mind is somewhat difficult to accept when one remembers that in 1952 the Copyright Act authorized only misdemeanor prosecutions, a circumstance that continued until 1982. Equally difficult to accept is the idea that Congress has in some fashion acquiesced by silence to the utilization of mail and wire fraud as copyright enforcement tools. One need only contrast the infrequent and, with exception of the Congressional reac-

tion to *McNally*, technical amendments to the mail and wire fraud statutes with Congress' exhaustive attention to developments affecting copyright law.

14. The government strenuously disagrees with me on this point. However, even the dissenters in *Dowling* (Justice Powell and White) saw the issue framed by the majority no differently than I do. As Justice Powell characterizes the opinion: "The Court holds today that 18 U.S.C. § 2314 does not apply to this case because the rights of a copyright holder are 'different' from the rights of owners of other kinds of property." *Dowling, supra* at 229, 105 S.Ct. at 3139 (Powell, J., dissenting).

15. See Government's Memorandum at 8.

ed the bulk of his opinion to the issue of "whether the history and purpose of § 2314 evince a plain congressional intention to reach interstate shipments of goods infringing copyrights." *Dowling, supra* at 218, 105 S.Ct. at 3134.[16] Nor can one explain why the same analysis should not be applied to the mail and wire fraud statutes, which like the Stolen Property Act, were enacted to fill enforcement gaps in state and federal law. Why is it not true of mail and wire fraud, as it is of ITSP, that "[n]o such need for supplemental federal action has ever existed ..., for the obvious reason that Congress always has had the bestowed authority to legislate directly in this area [of copyright infringement]"? *Dowling, supra* at 220, 105 S.Ct. at 3135. Finally, why would not the government's position here produce the same pernicious result that Justice Blackmun warned of in *Dowling,* of permitting the government to subvert the carefully calculated penalties of the Copyright Act by selectively bringing some prosecutions under the more generous penalties of the mail and wire fraud statutes?[17]

What the government is seeking to do is to punish conduct that reasonable people might agree deserves the sanctions of the criminal law. But as Justice Blackmun observed in *Dowling,* copyright is an area in which Congress has chosen to tread cautiously, relying "chiefly ... on an array of civil remedies to provide copyright holders protection against infringement," while mandating "studiously graded penalties" in those instances where Congress has concluded that the deterrent effect of criminal sanctions are required. *Dowling, supra* at 221, 225, 105 S.Ct. at 3135, 3137. "This step-by-step, carefully consid-

ered approach is consistent with Congress' traditional sensitivity to the special concerns implicated by the copyright laws." *Id.* at 225, 105 S.Ct. at 3137. Indeed, the responsiveness of Congress to the impact of new technology on the law of copyright, limned earlier in this opinion, confirms Justice Blackmun's conviction of "the wisdom of leaving it to the legislature to define crime and prescribe penalties." *Dowling, supra* at 228, 105 S.Ct. at 3138.

> "The judiciary's reluctance to expand the protections afforded by the copyright without explicit legislative guidance is a recurring theme. Sound policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials. Congress has the institutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably implicated by such new technology."

*Sony Corporation of America v. Universal City Studios, Inc.,* 464 U.S. 417, 431, 104 S.Ct. 774, 783, 78 L.Ed.2d 574 (1984) (citations omitted).

While the government's objective is a laudable one, particularly when the facts alleged in this case are considered, its interpretation of the wire fraud statute would serve to criminalize the conduct of not only persons like LaMacchia, but also the myriad of home computer users who succumb to the temptation to copy even a single software program for private use. It is not clear that making criminals of a large number of consumers of computer software is a result that even the software industry would consider desirable.[18]

---

16. The government's suggestion "that the legislative history of copyright protection serves only to provide 'additional reason to hesitate before extending § 2314 to cover the interstate shipments in this case'," and that *Dowling* simply held that " 'Congress has not spoken with the requisite clarity,' " seem to me equally applicable to the analysis of § 1343. Government's Memorandum at 8 (quoting *Dowling,* supra at 221, 229, 105 S.Ct. at 3135, 3139).

17. For example, a first offender who reproduces fewer than ten copies of a computer software program in a one hundred and eighty day period is subject to a maximum punishment of one year imprisonment. 18 U.S.C. § 2314(b)(3). The

same prosecution under the wire fraud statute would entail a maximum prison sentence of five years. As defendant also notes, use of the wire fraud statute to punish criminal copyright infringement would override the shorter three year statute of limitations of the Copyright Act.

18. In 1992, in hearings before the House Judiciary Subcommittee on Intellectual Property and Judicial Administration, the Vice–President and General Counsel of the Computer & Communications Industry Association testified as follows: "There are millions of people with personal computers to make copies. That is exactly one of the reasons I think you want to be very careful. You do not want to be accidentally taking a large

In sum, I agree with Professor Nimmer that:

> The *Dowling* decision establishes that Congress has finely calibrated the reach of criminal liability [in the Copyright Act], and therefore absent clear indication of Congressional intent, the criminal laws of the United States do not reach copyright-related conduct. Thus copyright prosecutions should be limited to Section 506 of the Act, and other incidental statutes that explicitly refer to copyright and copyrighted works.

3 *Nimmer on Copyright*, § 15.05 at 15–20 (1993). See also 2 Goldstein, Copyright, § 11.4.2.2, at 304 n. 67 (1989) ("[A]lthough the Court did not directly rule on whether the mail fraud statute encompassed the infringing conduct, its reasoning with respect to the Stolen Property Act, 18 U.S.C. § 2314, suggests that it would have treated the mail fraud statute similarly.")

Accordingly, I rule that the decision of the Supreme Court in *Dowling v. United States* precludes LaMacchia's prosecution for criminal copyright infringement under the wire fraud statute.[19]

This is not, of course, to suggest that there is anything edifying about what LaMacchia is alleged to have done. If the indictment is to be believed, one might at best describe his actions as heedlessly irresponsible, and at worst as nihilistic, self-indulgent, and lacking in any fundamental sense of values. Criminal as well as civil penalties should probably attach to willful, multiple infringements of copyrighted software even absent a commercial motive on the part of the infringer. One can envision ways that the copyright law could be modified to permit such prosecution. But, " '[i]t is the legislature, not the Court which is to define a crime, and ordain its punishment.' " *Dowling, supra*, 473 U.S. at 214, 105 S.Ct. at 3131 (quoting *United States*

*v. Wiltberger*, 5 Wheat. 76, 95, 5 L.Ed. 37 (1820)).

## ORDER

For the foregoing reasons, defendant LaMacchia's motion to dismiss is *ALLOWED*.

SO ORDERED.

---

percentage of the American people, either small business or citizens, into the gray area of criminal law." Hearing on S. 893 (August 12, 1992) at p. 65.

19. The issue presented in this case is one of infringement only. Infringement is a technical concept describing interference with the statutorily defined rights of a copyright holder. A scheme or artifice to defraud, the object of which was to fraudulently obtain possession of the copyright itself would, I believe, be clearly punishable under the mail and wire fraud statutes. See *Dowling, supra*, 473 U.S. at 217, 105 S.Ct. at 3133 ("[The infringer] does not assume physical control over the copyright, nor does he wholly deprive the owner of its use").